## NATIONAL LABOR RELATIONS BOARD v. FAIRMONT CREAMERY CO.

### No. 2861.

Circuit Court of Appeals, Tenth Circuit.

July 3, 1944.

Rehearing Denied July 29, 1944.

Leroy Marceau, Atty., National Labor Relations Board, of Washington, D. C. (Alvin J. Rockwell, Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, and Roman Beck and Thomas B. Sweeney, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Leonard A. Flansburg, of Lincoln, Neb. (Charles H. Flansburg, of Lincoln, Neb., on the brief), for respondent.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

PHILLIPS, Circuit Judge.

This is a proceeding for the enforcement of an order of the National Labor Rela-

tions Board[1] against The Fairmont Creamery Company.[2]

The order directs Fairmont to cease and desist from certain unfair labor practices and to reinstate, with back pay, three discharged employees, and post appropriate notices. Jurisdiction of the Board is conceded.

Fairmont operates a plant at Dodge City, Kansas, where it manufactures and processes dairy products, poultry, eggs, and mixed feeds. W. H. Richardson, a mechanic, Cecil Crane, a mechanic and supervisor, and Harold Miles, a truck washer and greaser, were employees in the garage of Fairmont. Leonard Perley worked in the garage on Sundays. They were engaged in their regular duties on Sunday morning, September 12, 1942. Union organizational activities had then started among the employees of Fairmont. About 10 o'clock A. M., September 12, Leroy Black, one of Fairmont's truck drivers who had become a member of the Union shortly prior thereto, went to the garage with some Union literature of the Chauffeurs, Teamsters and Helpers Union, affiliated with the American Federation of Labor. Perley and certain of the other employees were reading the literature. Shortly thereafter, Frank C. Evert, plant manager, came to the garage and, noting that Perley had the Union literature in his hand, inquired what was going on and asked Perley where he had obtained the literature. Perley replied that Black had given it to him. Evert then said "If you can't kick them damned cusses out of here, I can. They are nothing but Bolsheviks." Black and Perley then expressed dissatisfaction with the wages they were receiving. Evert told Perley he could get his time whenever he wished. Black quit immediately and Perley quit the next morning. During the forenoon of September 13, 1942, Evert saw Richardson and Crane and verbally agreed to increase their wages and to give them a bonus if they would stay with him. On that occasion, Evert said to Richardson "Bill, I have heard you talking a great deal about the Union." Richardson replied that he had joined the Union and he "didn't figure it was anybodys business" but his own.

About May 1, 1943, Richardson obtained some Union application blanks from Fairmont employee, Ivan Hibbard, whose father ran the Pay Day Market. He gave some of the blanks to Ardis Dye and Lawrence Black. Evert learned of Hibbard's activities, remonstrated with him for stopping one of the trucks as it was leaving town, and contacted Hibbard's father and urged him to stop Hibbard's Union activities. Immediately thereafter Fairmont discontinued selling dairy products to the Pay Day Market.

On Saturday, May 8, 1943, Evert sent for Crane and asked him whether the men "ever talked Union." Crane told Evert it had been quiet the last week or ten days. Evert replied "They are too damned quiet" and asked Crane to find out the employees' attitude toward the Union. On the same day, Hubert Smalley, a truck driver, was standing in the office and Evert asked him to come in and have a chair. Evert then asked Smalley what he knew about the Union. Smalley replied that he did not know anything. Evert then asked Smalley if he had joined the Union and when Smalley replied that he had not, Evert said "I am glad you didn't. I didn't think you would, because I think you are a good boy." On the same day, Roy Barnes, a truck driver, was in the main office checking in the day's receipts from his run. Evert started a conversation with Barnes and walked back into his office. Barnes followed him in, thinking Evert wanted to talk further. Evert then asked Barnes what he thought of the Union. Barnes replied "Well, that remains to be seen." Evert then asked Barnes if he had joined the Union and what he hoped to gain from it. When Barnes replied that he had joined the Union, Evert asked him if he would back out, and told him most of the boys he had talked to who had signed up were ready to back out. Evert also told Barnes that the Union could not secure a wage increase because wages were frozen and that if the men joined the Union, they would suffer a loss of earnings because the Union would insist on shorter hours and the employees would have to pay all the expenses on the trucks if the plant was organized. On the same day, Evert addressed like arguments to Virgil Mayfield, employed as a city truck driver, and asked him to resign from the Union. He also told Mayfield that if the Union was successful in organizing the plant, Mayfield would be permanently assigned to a country run.

---

[1] Hereinafter called the Board.

[2] Hereinafter called Fairmont.

Mayfield did not desire a country run because it would keep him away from home at night.

On May 15, 1943, Barnes was notified that Evert wanted to see him. Barnes went to the office and Evert called in seven department heads. Evert then asked Barnes when he went to work and what time he got off and if he took an hour off at noon. After Barnes had answered, Evert told Barnes that he had engaged in Union activities while on duty and said to Barnes "You haven't got sense enough to know what you are trying to pull." He then called Barnes an opprobrious name and said that went for the other members of the Union and told Barnes he ought to "knock his block off" and said "Get out of here and get back down to work before I take a swing at you. The next time I will fire you."

About May 1, 1943, Homer Lake, head of the power department and foreman of the electricians and maintenance department, told Crane he could stop all Union activities by shutting the burners off on the boilers.

Louis Schaapveld was employed in the creamery department under foreman William Carey. In May, 1943, Carey asked Schaapveld what he thought of the Union. Schaapveld replied that he thought it was O. K. and the only thing that would hold wages up after the war was over. Carey told him he did not think they could pay higher wages when the war was over. Carey contacted Schaapveld again that evening and accused him of telling employees they had better sign up or they would lose their jobs. Schaapveld asked him to prove it and Carey said "Oh, you didn't do it?" Carey then told him what the company had done for him, asked Schaapveld if he had signed up and instructed him not to sign up the girls in his department. Schaapveld replied that he would not, that they had been already signed up. Carey then asked him where the Union started and Schaapveld told him he thought "the truck drivers started it." Carey then said "At least, I can be thankful that it didn't start in the creamery." On May 10, 1943, Carey had a conversation near his desk in the creamery department with Pearl Bennett and Marie Springer. He complimented their work and said "I guess you have heard something about the Union." They replied that they had heard about it in the

dressing rooms. Carey told them they were soldiers' wives and they would not want to pay out $10.00 and not get any good out of it, and that if the Union succeeded in organizing the plant, they would not be allowed to transfer to other departments when work was slack in their own. A few days later, Carey told Betty Winsor, an employee in the creamery department, that the Union was just a racket, a scheme to get their money. About May 14, 1943, Carey called a meeting of the 18 employees of the creamery. He told them that they would not be fired if they joined the Union, but that it was not patriotic and was not helping the boys in the service.

On May 11, 1943, a Union meeting was held at Moose Hall in Dodge City. While employees were entering the hall, Ed Thorp, poultry and egg foreman, Elmer Schooley, foreman of the fruit and vegetable department, and R. L. Speck, office manager, sat, for approximately 45 minutes, in an automobile parked across the street from the hall in which the meeting was being held, and noted the Fairmont employees who were entering the hall. Richardson went over to the automobile and asked Schooley and Speck if they were checking the employees who were attending the Union meeting. Speck admitted that he was checking the employees.

On the morning after the above-mentioned Union meeting, Thorp told employee Williams he had seen her at the meeting and asked her whether she had joined the Union. When she replied she had only attended the meeting, Thorp said "Well, if you haven't joined, give me your little receipt," referring to the Union application form. Williams stated that she did not get a receipt but that "they signed them up" at the meeting. Thorp told her the Unions were "all a fake" and "that they don't promise you as many hours as you are supposed to get." The following Friday he again asked her if she had joined the Union and told her "I want you to keep the Union quiet. There is too much going on around here now."

Prior to May 17, 1943, it had been the custom of Fairmont's employees to leave the plant during a ten-minute rest period in midmorning and midafternoon to obtain refreshments. About that date, Fairmont notified its employees that they were no longer to leave the plant during rest periods. The reason given was that the employees were not getting back on time

and were delaying plant operations. About May 20, 1943, Fairmont posted a notice in the plant, signed by Evert, addressed "To All Fairmont Employees," which read:

"Conversations or Activities on Company time or property, except those necessary to perform our regular work, interfer with production. Our contribution to the war effort necessitates full production of the vital foods we process.

"You are requested to assist in enforcing our standing rule, which prohibits such interruption of production.

"Sincerely,

"The Fairmont Creamery Co.

"Frank C. Evert, Manager."

The Board found that the above measures were adopted not to promote efficiency, but to hinder Union adherents in carrying on organizational activities.

Barnes did not comply with Evert's request made on May 8, 1943, that he resign from the Union. About two months prior thereto, Barnes had asked foreman Schooley to be transferred from his Dodge City route to a country run. Barnes wanted the country run because his earnings would be greater. About May 5, 1943, Barnes was given a country run. On May 7, he assumed his new duties. On May 10, Barnes found a note in his drawer directing him not to go out on the country run and stating he would be used in the plant. Barnes asked Schooley for an explanation. Schooley referred him to Evert. Barnes carried his protest to Evert. Schooley was present. In answer to Barnes' protest, Evert resurrected a criticism of Barnes' work, based on an incident that had occurred a year before. Schooley asked Barnes whether he thought he had cooperated with Fairmont 100 per cent. Evert told Barnes if he demonstrated a willingness to do what was right, he might be restored to his position as a truck driver within a short time and assigned him to the poultry department. Mayfield was given Barnes' country run, notwithstanding he had expressed to Evert on May 8, 1943, a desire not to work on a country run and stated he would resign rather than work on a country run. Mayfield took the country run but was soon compelled to give it up because of physical disability. He was then put to work feeding chickens on the night shift at a lower rate of pay.

Fairmont asserts that the actions taken by it and the statements of Evert and the foremen were for the purpose of preventing Union activities during working hours in order to promote efficiency and that they were permissible under the right of freedom of expression. It is obvious that the actions taken by Fairmont and the statements made by Evert and the foremen, in the light of the surrounding facts and circumstances, went far beyond a mere expression of views with respect to labor policies or problems. We hold that they amounted to unlawful interference with the rights of the employees guaranteed by § 7 of the National Labor Relations Act and constituted unfair labor practice under § 8(1) of such Act, 29 U.S.C.A. §§ 157, 158 (1). See Utah Copper Co. v. National Labor Relations Board, 10 Cir., 139 F.2d 788, 790, 791.

Victor McDaniel was employed by Fairmont intermittently for four or five years. He was discharged by Fairmont on May 8, 1943. His foreman testified that McDaniel was a trained hatchery man and that it was difficult for Fairmont to secure a man of his training. McDaniel joined the Union on April 23, 1943, and solicited members for the Union among his fellow employees. On May 8, 1943, Floyd Harris, a foreman, asked Charles Simmons if McDaniel was pushing the Union. Simmons replied not that he knew of. Harris then said that he had heard in a roundabout way that McDaniel was pushing the Union. On May 6, 1943, McDaniel was given permission by Harris to be absent from his work on May 8, 1943, in order to haul feed for his livestock on a small farm which he owned. After attending to the purchase of the feed, McDaniel went to Fairmont's plant at about 1 o'clock P. M., on May 8, 1943, in order to get some grain that he had purchased. Evert discharged McDaniel, asserting that he had been taking too many days off. It had been reported to Evert that McDaniel was seen on the streets downtown. Harris admitted that McDaniel had never been absent from work without permission; that he had not recommended McDaniel's discharge, and that he had retained McDaniel in spite of occasional absence because it was difficult to replace a man of McDaniel's qualifications.

Ardis Dye was discharged on May 10, 1943, allegedly because of excessive absence from work. She operated a bottling machine in the creamery department, a position of responsibility. Mrs. Dye is the mother of two small children. At the time

of her employment, her foreman, Carey, agreed to give her a leave of absence to go to Denver to arrange for the care of her children. In March and April, 1943, she was given further time off when it became necessary to make other arrangements for their care. She was off for two periods aggregating eleven days in December, 1942, and for three days in March, 1943 and three days in April, 1943. On two of such occasions she overstayed her leave. On May 8, 1943, she absented herself without permission in order to be with a soldier friend who was on furlough. She sent word to Carey that she would report for work at noon. The train on which her friend was leaving was late and she did not report at all on Saturday. She returned to work the following Sunday morning. Carey reported those facts to Evert and he told Carey to discharge her. She was regarded as a good worker. In January, 1943, she was given a wage increase. Only a short time before her discharge, assistant foreman Briggs praised her work and asked her to assist in training new employees. Carey had also commended her work and attitude. On May 7, 1943, Carey asked her to suggest the employee best qualified for a position in her department. Carey conceded that she had been an efficient employee. She joined the Union at one of its organizational meetings on May 6, 1943. By May 9, she had enrolled 15 of her fellow employees. On Saturday night, May 8, assistant foreman Briggs saw her in a group of her fellow employees, among whom was Richardson. On Monday, May 10, Evert asked Richardson how he had fared at the Union meeting.

Lawrence Black, a truck driver, was discharged by Evert on May 15, 1943. That morning Black drove his truck to Fairmont's branch at Liberal, Kansas. On arriving there, he turned his bills of lading over to branch manager Wilks. Black customarily used the billfold in which the bills of lading were contained for his personal papers, and had placed some applications for membership in the Union in the billfold the day before. On going through the bills of lading, Wilks discovered the Union forms which Black had inadvertently left in the billfold and at once telephoned Evert of the discovery. When Black had finished unloading his truck, Wilks questioned Black about the Union forms and instructed Black to return with him to Dodge City. When Black arrived at Dodge City, Evert sent for him. Evert said to Black "You have got your tite in a wringer. Your check and release are all made out." He told him he was discharging him for transporting material other than company property. Black asked to call witnesses. Evert refused to specify in the discharge the specific property transported. Black had been in Fairmont's employ for 14 months at the time of his discharge and had received two wage increases during that period. He joined the Union on April 23, 1943. He solicited members for the Union among his fellow employees and was present at the meeting of May 11, when the foremen checked the employees who attended the meeting. There was evidence that customers had reported that they had had trouble in getting Black to pick up milk bottles; that Evert once came across Black playing a pin ball machine when he was supposed to be working; that he had been requested to take certain truck routes and had refused them. He was absent from February 15 to 18 without giving notice to Fairmont. In May, 1943, he talked to Seidell, one of Fairmont's employees, on company time about joining the Union. This was reported by Seidell to Evert.

The Board found that Fairmont discharged and refused to reinstate the three employees above mentioned because of their Union membership and activity in violation of § 8(3) and (1). The credibility of the witnesses, the weight of the evidence, and the inferences to be drawn therefrom are for the Board and its findings will not be set aside if supported by substantial evidence.[3] While the evidence was conflicting and would have supported a finding that the discharges were for reasons other than Union membership and activity, other evidence and legitimate inferences which could be drawn therefrom were sufficient to support the findings of the Board.

The order of the Board will be enforced.

[3] National Labor Relations Board v. Nevada Consolidated Corp., 316 U.S. 105, 107, 62 S.Ct. 960, 86 L.Ed. 1305; The Locomotive Finished Material Co. v. National Labor Relations Board, 10 Cir., 142 F.2d 802; Utah Copper Co. v. National Labor Relations Board, 10 Cir., 139 F.2d 788, 790.