NATIONAL LABOR RELATIONS BOARD
v. MONUMENTAL LIFE INS. CO.
No. 10324.

Circuit Court of Appeals, Sixth Circuit.
June 3, 1947.

Lewis Newman, of Washington, D. C. (Gerhard P. Van Arkel, Morris P. Glushien, A. Norman Somers, Marcel Mallet-Prevost and Frederick D. Vincent, Jr., all of Washington, D. C., on the brief), for petitioner.

James W. Havighurst, of Cleveland, Ohio (Thompson, Hine and Flory, James W. Havighurst and John A. Wilson, all of Cleveland, Ohio, on the brief), for respondent.

Before SIMONS, ALLEN and MILLER, Circuit Judges.

ALLEN, Circuit Judge.

The National Labor Relations Board filed a petition under § 10(e) of the National Labor Relations Act, 29 U.S.C.A. § 160(e), for enforcement of an order issued April 11, 1946, requiring respondent, a corporation engaged in the business of writing life insurance, having numerous district offices in various states, including Ohio, to cease and desist from unfair labor practices found to exist in violation of § 8(1) of the Act, 29 U.S.C.A. § 158(1), to offer rein-

statement with back pay to one Julius Walther, and to post the usual notices. The Board found that respondent had interfered with, restrained, and coerced its employees in the exercise of their rights to organize and had discharged Walther because of union activity. The respondent admits that it operates in interstate commerce, but contends that enforcement should be denied (1) upon the ground that its acts and statements with reference to the union are lawful and (2) upon the ground that Walther was discharged, not because of union activity, but because of flagrant violations of respondent's rules governing the conduct of its agents.

The facts mainly are not in controversy, and are as follows: In December, 1944, the United Office and Professional Workers of America CIO, hereinafter referred to as the union, started to organize respondent's insurance agents in several of its Ohio offices. On January 15, 1945, the union filed a petition for investigation and certification of representatives in respondent's Cleveland offices, which was later amended to cover all Ohio offices. As a result of this petition a hearing was held on February 17, 1945, and Walther, an agent of respondent, called by the Board to testify, was the only witness. Walther was discharged on March 10, 1945, and thereupon the union filed a charge of unfair labor practices against respondent. After various proceedings an election was ordered and held on August 2, 1945, at which the employees voted against the union 78 to 55.

The record fully sustains the finding of the Board that shortly after the union instituted its drive to organize the Cleveland offices the respondent instituted a campaign of interference, restraint and coercion among its employees. It is not necessary to detail the statements made by respondent's officials and office managers which were not only derogatory to the union, but carried with them the threat of loss of employment. They follow a familiar pattern. While a number of the statements standing alone might be considered to be merely non-coercive statements of honest opinion with reference to the desirability of union organization, such as

342

have been repeatedly held not to violate the Act, National Labor Relations Board v. Ford Motor Co., 6 Cir., 114 F.2d 905; Midland Steel Products Co. v. National Labor Relations Board, 6 Cir., 113 F.2d 800; National Labor Relations Board v. West Kentucky Coal Co., 6 Cir., 152 F.2d 198, they are set against a background of actual coercion and are not protected by the First Amendment to the Constitution of the United States. National Labor Relations Board v. Elyria Telephone Co., 6 Cir., 158 F.2d 868; National Labor Relations Board v. Peterson, 6 Cir., 157 F.2d 514. Typical is the declaration of Niehaus, manager of a Cleveland office, to one agent, that "As far as the Union is concerned * * * we can find enough on practically any man in the office to get rid of him." Niehaus continued: "Now, take the case of Mr. Walther. * * * He is just hanging on by his shoe string. * * * We can let him go any time." Similarly, Eugene D. Moebius, an agent, was warned to stay away from the hearing in the unfair labor case. The manager said he "thought it advisable" for Moebius not to be at the hearing because he "might get hurt." Moebius said he did not think that would be right because Walther had gone out on a limb for the men. He said, "If you were in Mr. Walther's position—", and the manager said, "I wouldn't get in Mr. Walther's position."

■ Such statements plainly carry with them threats of retaliation for union activity and constitute a violation of § 8(1) of the Act. In view of their coercive character, the court cannot properly refuse enforcement of the order upon the ground that other statements made by respondent's officials, when considered apart from the whole series of transactions, were on their face not improper.

Respondent also vigorously contends that the reinstatement of Walther constitutes a violation of public policy and must be set aside under the rule laid down by this court in National Labor Relations Board v. U. S. Truck Co., Inc., 124 F.2d 887.

■ Walther had been employed as an insurance agent in respondent's Cleveland office in 1932. He had been assistant man-

ager, home office representative, and office manager. In 1941 he was demoted to assistant manager, and in December, 1942, he was demoted, dismissed, and reinstated as soliciting agent, in which capacity he was employed until discharged on March 10, 1945. The union's organizational drive which began in Cleveland in December, 1944, was promoted and led by Walther. He not only organized three of respondent's Cleveland offices, but also organized the Akron office. He wore a union button in working hours, and was the sole witness at the hearing of February 17, 1944. The Board approved and adopted the findings of the trial examiner, who found that the respondent did not dispense with Walther's services because of his derelictions but because of his union activity. This finding also must be sustained.

Walther not only was careless and inaccurate, but also engaged in sharp and doubtful practices in selling insurance for respondent and thereby violated its formal rules. In several cases he undoubtedly did misrepresent the facts with reference to the right to withdraw funds under respondent's policies. However, the course of dealing between the parties and evidence of the widespread use of the same practices among other of respondent's agents supports the conclusion that Walther's discharge on March 10, 1945, was based actually not upon his shortcomings but upon the leading part which he played in the effort to unionize the offices. Prior to December, 1944, Walther was reprimanded for similar practices. Not only was he not discharged, but on the contrary, he received several letters expressing official commendation of the "outstanding job" which he had done as agent, the last letter being dated January 9, 1945.

Shortly after the union began its organizational drive the respondent's home office instituted an investigation into 109 applications for industrial policies obtained by Walther in 1944. It was respondent's policy to "spot check" about ten per cent of an agent's applications. The inspection of 109 applications amounted to substantially a one hundred per cent reinspection of Walther's work, and was most unusual. The investigation was instituted immediate-

ly after Walther began to lead the organizational drive.

Walther testified that Willis Ebosh told him, based upon talks with the managers at a time when Willis Ebosh was assistant manager, that Walther was demoted in 1942 because at that time he was implicated in union activities. After Walther had been dismissed, Louis Ebosh, who then and during all this period was an assistant manager, was talking to Walther about the dismissal, and said: "Every one of us, including the officials of the company, could be dismissed for those charges * * * we have all committed those crimes." Louis Ebosh said the charges were "silly." Neither Ebosh was called upon to testify, although both were available, and these statements are uncontradicted. Moreover, Kish, an applicant for a policy, who complained that the savings feature of respondent's policy had been misrepresented to him, an offense which respondent considered the most serious offence committed by Walther, stated that Louis Ebosh was the one who had made the misrepresentation in his particular case.

Substantial evidence exists that the respondent was not strict in securing from its agents compliance with its rules, nor overcareful as to the manner in which they sold insurance. The finding is sustained by the record that the respondent became deeply concerned about Walther's improprieties only after December, 1944, when the organization drive began.

■ Our decision in National Labor Relations Board v. U. S. Truck Co., supra, relied upon by respondent, is not in point. There we held that where an order of the Board directing reinstatement of employees indisputably requires the employer to violate statutes highly important to the public safety, this court has authority to vacate the order as against public policy and contrary to law. While we adhere to the doctrine of that decision, it does not cover this case, where no violation of statute or of rules having the force of statute is involved. All that is presented here is an infraction of respondent's rules, which respondent does not itself strictly enforce. Moreover, respondent's contention that enforcement of the order will conflict with the provisions of § 654-4 of the General Code of Ohio has no merit. The order of the Board in no way curtails the respondent's obligation to state the truth when it applies to the State Superintendent of Insurance for renewal of any agent's license. Should the respondent, after offering reinstatement to Walther, as directed by the decree be unable to comply with the decree by reason of Walther's failure to obtain a renewal of his license from the State Superintendent of Insurance, the respondent may without prejudice petition this court for an amendment of its decree.

A decree will issue enforcing the order as prayed in the petition.