**NATIONAL LABOR RELATIONS BOARD
v. DIXIE SHIRT CO., Inc.**

No. 5904.

United States Court of Appeals
Fourth Circuit.

Argued July 5, 1949.

Decided Sept. 24, 1949.

Fannie M. Boyls, Attorney, National Labor Relations Board, Washington, D. C. (David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel, and Samuel Ross, Attorney, National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

L. W. Perrin, Spartanburg, S.C. (Perrin & Perrin and L. W. Perrin, Jr., Spartanburg, S. C., on the brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This case is before us upon a petition of the National Labor Relations Board (hereinafter called the Board) for the enforcement of its order issued against the Dixie Shirt Company, Inc. (hereinafter called Dixie), following proceedings under the National Labor Relations Act (hereinafter called the Act), Sections 9 and 10, 29 U.S. C.A. §§ 159, 160.

A charge against Dixie was filed by the United Garment Workers of America, af-

filiated with the American Federation of Labor (hereinafter called the Union); also objections were filed to an election held on March 20, 1946. The Board issued an order consolidating the complaint case and the representation case.

After the issuance of a complaint against Dixie by the Board, a hearing was held before Trial Examiner Greenberg. After this hearing, but prior to the filing of an intermediate report, the Union filed with the Board a statement alleging bias and prejudice on the part of Greenberg based in part on an allegation that the Examiner had received shirts from the company during the hearing. The Examiner denied the charge but stated that during the hearing, in the presence of all the parties, he asked one of the officials of the company whether the company would sell him one dozen shirts and was later informed, in the presence of all the parties, that the purchase could be arranged. Subsequently the Examiner came to the conclusion that he had done an unwise thing and notified the company that he regretted having made the request in view of the possibility that his motive be misconstrued and withdrew the request. In view of these circumstances, the Examiner, of his own motion, asked to be relieved from further participation in the case because while he was not conscious of any bias for or against any of the parties, he feared that having been the object of unjustified accusation, his state of mind might unconsciously influence his decision one way or the other. His request was granted and the Chief Trial Examiner informed the parties that if it was desired, a new hearing would be granted before another trial examiner, but that if no such new hearing was requested, a new trial examiner would be appointed to prepare an intermediate report upon the record already made.

Neither party requested a new hearing. Trial Examiner Riemer was thereupon designated to prepare an Intermediate Report on the record. This he did and the findings and conclusions of Riemer, with certain modifications and additions, were duly adopted by the Board.

The order of the Board, duly issued upon the basis of its findings, required Dixie to cease and desist from unfair labor practices which interfered with, restrained and coerced employees in the exercise of rights guaranteed to them by Section 7 of the Act, 29 U.S.C.A. § 157; to post appropriate notices; and to offer reinstatement to Dorothy Gaston and make her whole, after her discharge for Union activity, in violation of Section 8(3) of the Act, 29 U.S.C.A. § 158(3).

Five questions are presented to us for decision in this proceeding:

(1) Whether there was error, prejudicial to Dixie, in the Board's consolidation of the unfair labor practice case and the representation case;

(2) Whether there was error, prejudicial to Dixie, in the appointment of a second Trial Examiner to prepare an Intermediate Report, after the first Trial Examiner (who heard the evidence and saw the witnesses) had been relieved after charges of bias and prejudice were filed against him by the Union;

(3) Whether there was substantial evidence to support the Board's finding of unfair labor practices by Dixie;

(4) Whether there was substantial evidence to support the Board's finding that Dorothy Gaston was discharged because of her activities on behalf of the Union; and

(5) Whether the Board's order was valid and proper.

We have no hesitation in upholding the Board's action in consolidating the two cases here—the complaint case and the representation case. This is a customary and proper procedure that saves time and expense. Nor were any of Dixie's substantial rights thereby prejudiced. The Board's action was in line with its Rules and Regulations, Series 4, Section 203.58, Subsection (c) (2), and Section 203.42(b). See, also, Inland Empire Dist. Council, Lumber & Sawmill Workers Union, Lewiston, Idaho, v. Millis, 325 U.S. 697, 700, 65 S.Ct. 1316, 89 L.Ed. 1877, rehearing denied 326 U.S. 803, 66 S.Ct. 11, 90 L.Ed. 489;

National Labor Relations Board v. American Laundry Machinery Co., 2 Cir., 152 F. 2d 400, 401; National Labor Relations Board v. J. L. Brandeis & Sons, 8 Cir., 145 F.2d 556, 558; National Labor Relations Board v. Niles Fire Brick Co., 6 Cir., 124 F.2d 366, 367, 368, certiorari denied 316 U. S. 664, 62 S.Ct. 944, 86 L.Ed. 1740; National Labor Relations Board v. McKesson & Robbins, 74 App.D.C. 28, 121 F.2d 84, 94, certiorari denied 314 U.S. 674, 62 S.Ct. 138, 86 L.Ed. 539; Cupples Company Manufacturers v. National Labor Relations Board, 8 Cir., 103 F.2d 953, 955.

■ The Board's procedure in relieving the first examiner from further participation in the case and directing a new trial examiner to prepare the intermediate report was not improper under the circumstances of the case and did not constitute prejudicial error. It is, of course, altogether desirable that the trial examiner who conducts the hearing and sees and hears the witnesses shall write the intermediate report; but the change of examiners in this case, based as it was upon the request of Examiner Greenberg on the ground that he deemed himself disqualified, was in accordance with the Administrative Procedure Act, Sections 5(c), 7(a) and 8 (a), 5 U.S.C.A. §§ 1004(c), 1006(a), 1007 (a). See the legislative history of the Administrative Procedure Act containing the reports of the Judiciary Committees of the Senate and House of Representatives, 79 Cong. 1944-6, pp. 203, 206, 207, 209. Prior to the passage of the statute, it had been held that such a change of examiners did not offend the requirements of due process in violation of the Federal Constitution or the National Labor Relations Act[1]; but the practice is now settled by the statute which provides in Section 5(c) that the same officers who preside at the reception of evidence, pursuant to Section 7, shall make the recommended decision or initial decision required by Section 8, except where such officers become unavailable to the agency, and in Section 7(a) that "any such officer may at any time withdraw if he deems himself disqualified."

■ We think, too, that there is substantial evidence to support the Board's finding that Dixie engaged in unfair labor practices, in violation of Section 8(1) of the Act, by acts interfering with, restraining and coercing its employees. A very brief review of some of the most important facts, brought out in the record, would seem in order.

In January, 1946, Harry Abrams (Vice-President and Treasurer of Dixie) announced the promulgation of new piece-work rates for the employees, which would become effective February 4, 1946. The employees, with good reason, feared the new rates would result in wage cuts. Dorothy Gaston (an employee of Dixie) sought the aid of Gordon Chastain (an A. F. of L. organizer) in organizing a local of the Union among Dixie's employees.

In late January, 1946, Abrams queried employee Eliza Horton about news of the Union and who was responsible for starting it. When Horton replied that she was unable to give this information, Abrams told her "to find out about it and let him know." When she did not report back to him, Abrams accused her of being more friendly to the Union than to the Company. There was evidence of surveillance of a Union meeting early in February by Foreman Curry.

On February 13, 1946, at a meeting of high officers of Dixie and representatives of the Union, the Union claimed that it represented a majority of Dixie's employees, expressed its desire to bargain and requested that an employee committee, chosen at a previous Union meeting, be permitted to attend the bargaining confer-

1. See, National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 350-351, 58 S.Ct. 904, 82 L.Ed. 1381. And, see also, Consolidated Edison Co. of New York v. National Labor Relations Board, 305 U.S. 197, 226-229, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Weirton Steel Co., 3 Cir., 135 F.2d 494, 496; National Labor Relations Board v. Botany Worsted Mills, 3 Cir., 133 F.2d 876, certiorari denied 319 U.S. 751, 63 S.Ct. 1164, 87 L.Ed. 1705; National Labor Relations Board v. Air Associates, Inc., 2 Cir., 121 F.2d 586, 591.

ence. President Cohen of Dixie disclaimed any knowledge of the Union's presence in the plant, and despite the Union's offer to submit proof of the signing of membership applications by 400 Dixie employees, Cohen refused either to bargain or to permit the Union's employee committee to attend the meeting. On the Union's petition for certification, the Board scheduled an election for March 20, 1946.

There was ample evidence that Dixie started a vigorous campaign to defeat the Union in this election by threats and intimidation of employees on the part of Dixie's supervisory officials. Thus foreman Wilson warned employee Dugan that she would regret Union membership and that she would have difficulty in obtaining other employment. Superintendent Galle told Dorothy Gaston: "Dorothy, you had better think a long time before you take the lead in this Union. If you take the lead * * * you will be fully responsible for all the girls in the plant and whatever happens you will have to take it." Foreman Massa threatened employees under him that Union membership would cause a reduction in their wages and would force them to wash dishes for a living. Similar expressions were voiced by forelady Curry to employees Chapman and Woodruff. Forelady Henderson told Daisy Graham that the girls would be "better off without a Union" and that membership in the Union would require employees to strike and pay fines and assessments. General forelady Bellflower stated for the benefit of employees of the boxing department that the Union caused "folks to starve to death." Other similar incidents could be cited.

The Union lost the election by 5 votes— 286 votes were cast for, 291 votes against, the Union. But this caused no cessation of Dixie's campaign against the Union. Vice President Abrams told Dorothy Gaston (Union President): "We don't want a Union, but we won't do anything until we have to defend ourselves again, and then we will fight again." Abrams further told Gaston that before this thing is over she was going to cost Dixie $10,000. Superintendent Galle told Gaston that the Union

was a "damn nuisance" and that the girls would be sorry if they got the Union in the plant. He further threatened to close the ladies' rest rooms because the girls spent too much time there gossiping about the Union. Since these employees were pieceworkers, it was not to their interest to spend much time in their rest rooms during working hours.

On another occasion, Gaston had been distributing Union cards in the plant before working time. General forelady Bellflower sternly forbade this practice, and, the next day she directed Gaston to report to Vice-President Abrams. Abrams told Gaston: "You told her (Bellflower) that what you did on your own time was your business, but I tell you that as long as you work for us you will abide by our rules or you won't work here. I forbid you to use your influence in any way in this plant to get anybody to join the Union. If you do so, I will be forced to dismiss you." There was no evidence that Dixie had ever before announced any rule forbidding such activity in the plant during non-working time.

In the light of the foregoing facts (which do not quite tell the complete story) we have no hesitation in deciding that there was clearly substantial evidence to sustain the Board's finding that Dixie had interfered with, restrained and coerced its employees, in the exercise of rights guaranteed to them under the Act, by unfair labor practices. See, Republic Aviation Corporation v. National Labor Relations Board, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 557, 157 A.L.R. 1081; H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 518, 520, 61 S.Ct. 320, 85 L.Ed. 309; National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 270, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 75, 57 S.Ct. 645, 81 L.Ed. 921, 108 A.L.R. 1352; National Labor Relations Board v. Harris-Woodson Co., Inc., 4 Cir., 162 F.2d 97, 100; National Labor Relations Board v. Fairmont Creamery Co., 10 Cir., 143 F.2d 668, 670-671, certiorari denied 323 U.S. 752, 65 S.Ct. 87, 89 L.Ed. 602; Na-

tional Labor Relations Board v. Baltimore Transit Co., 4 Cir., 140 F.2d 51, 56, certiorari denied 321 U.S. 795, 64 S.Ct. 848, 88 L.Ed. 1084; National Labor Relations Board v. Vincennes Steel Corporation, 7 Cir., 117 F.2d 169, 172. And see, particularly, National Labor Relations Board v. Norfolk Southern Bus Corporation, 4 Cir., 159 F.2d 516, 518, certiorari denied 330 U. S. 844, 67 S.Ct. 1085, 91 L.Ed. 1290, where Circuit Judge Parker, speaking for our Court, said: "Questioning of employees concerning union membership and activities and disparaging remarks by supervisory employees made in such way as to hamper the exercise of free choice on the part of the employees, have been uniformly condemned as violation of the Act."

▮ This brings us to the most difficult question in this case—whether we can support the Board's finding that Dixie discharged Dorothy Gaston, in violation of Section 8(3) of the Act, because of her Union activities. We think this must be answered in the affirmative.

Gaston was admittedly an experienced, skilful and fast operator. She had been with Dixie for more than 10 years when she was discharged, May 18, 1946. She first sought out a Union organizer, she secured the signatures of about 150 employees on Union applications, she was elected president of the Union Local February 11, 1946. Her militant Union activities were well known to, and heartily disapproved by, high officials of Dixie.

When Union representatives attempted to bargain with Dixie, in mid-February, 1946, Superintendent Galle and Personnel Manager Cohen sought out Gaston and requested her "to keep the girls on their jobs and keep everything quiet." On Gaston's inquiry why she was selected for this admonition, Cohen replied: "This whole Union centers around you." Later Galle chimed in with another warning against Gaston's Union leadership: "If you take the lead, then you will be fully responsible for all the girls in the plant and whatever happens you will have to take it." We have already adverted to the threat of Vice President Abrams to Gaston: "I forbid you to use your influence in any way in this plant to get anybody to join the Union. If you do so, I will be forced to dismiss you."

The reason assigned by Dixie for Gaston's discharge was her taking home some remnants or scraps of material in violation of a company rule which was the culmination of a series of instances of insubordination and infraction of rules on her part, that included the improper adjustment of her machine so as to increase her production at the expense of the quality of the goods and the inclusion in the work tickets submitted by her for compensation certain tickets of another employee who had already been paid for the work.

The Examiner stated that the issue as to whether Gaston was discharged for her union activities or for her infraction of the rules and insubordination was a difficult one to decide in the absence of an opportunity to observe and appraise her and the others who testified concerning her conduct as an employee and as a union organizer. However, he resolved the issue against the company and reached the conclusion that the taking of the material was seized upon by the company as a pretext for getting rid of an employee who was active on behalf of the union. He based his conclusion on Gaston's leadership in union activities, and on her reasonably satisfactory work as an employee for eleven years, and the uncertainty and conflicts in the evidence as the value of the material and as to the publicity given to the rule and the strictness with which it was enforced.

The majority of the Board affirmed this conclusion but the difficulty of decision is shown by the dissent of the third member who was strongly of the opinion on the preponderance of the evidence that Gaston was discharged for misconduct in respect to the removal of the cloth and other matters outlined above.

▮ It is not our duty or responsibility to weigh the evidence and pass upon conflict of opinion. It is sufficient to state our conclusion on the facts viewed against the whole background of the case that the finding of the Board is supported by substantial evidence.

Said Circuit Judge Parker, speaking for our Court in Hartsell Mills Co. v. National Labor Relations Board, 4 Cir., 111 F.2d 291, 293: "It must be remembered, in this connection, that the question involved is a pure question of fact; that, in passing upon it, the Board may give consideration to circumstantial evidence as well as to that which is direct; that direct evidence of a purpose to violate the statute is rarely obtainable; and that where the finding of the Board is supported by circumstances from which the conclusion of discriminatory discharge may legitimately be drawn, it is binding upon the courts, as they are without power to find facts or substitute their judgment for that of the Board." See, also, National Labor Relations Board v. Harris-Woodson Co., Inc., 4 Cir., 162 F.2d 97, 101; National Labor Relations Board v. Wallace Manufacturing Co., Inc., 4 Cir., 95 F.2d 818, 820.

■ We conclude with a few words as to the validity of the specific terms of the Board's order which follows the usual form in similar cases. In the light of the Board's findings, which we have upheld, no serious objection can be made to those parts of the order which require Dixie to cease and desist from its unfair labor practices and to post appropriate notices. Dixie strenuously urges, however, that the Board is without power to require the reinstatement of Dorothy Gaston with back pay, by virtue of Section 10(c) of the Labor Management Act of 1947, 29 U.S.C.A. § 160(c), which provides: "No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." The legislative history of this Act negatives this contention. This seems to be clearly shown by the statement of Senator Taft (Cong.Rec., Senate—June 6, 1947, p. 6677): "I think the Senator is completely mistaken. That is not at all the effect of this language. It merely states the present rule. If a man is discharged for cause, he cannot be reinstated. If he is discharged for union activity, he must be reinstated. *In every case it is a question of fact for the Board to determine."* (Italics ours.) See, also, Phelps-Dodge Corporation v. National Labor Relations Board, 313 U.S. 177, 187-188, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217; National Labor Relations Board v. Caroline Mills, Inc., 5 Cir., 167 F.2d 212, 213; National Labor Relations Board v. Sandy Hill Iron and Brass Works, 2 Cir., 165 F.2d 660, 662.

The petition for the enforcement of the Board's order is granted and this order will be enforced.

Order enforced.