**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HOBART BROTHERS COMPANY, Respondent.**

No. 16643.

United States Court of Appeals
Sixth Circuit.

Feb. 7, 1967.

Nancy Sherman, Atty., National Labor Relations Board, Washington, D. C., for petitioner, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Walter Meyer, Atty., National Labor Relations Board, Washington, D. C., on the brief.

Arthur R. Donovan, Evansville, Ind., for respondent, Harry P. Dees, Joseph A. Yocum, Evansville, Ind., on the brief, Kahn, Dees, Donovan & Kahn, Evansville, Ind., of counsel.

Before WEICK, Chief Judge, and EDWARDS and PECK, Circuit Judges.

WEICK, Chief Judge.

The National Labor Relations Board has petitioned to enforce its order holding that Hobart Brothers Company had violated Sec. 8(a) (1) of the National Labor Relations Act, 61 Stat. 140 (1947), as amended, 29 U.S.C. § 158(a) (1) (1964), by sending to its employees a letter which the Board found had threatened them with reprisals for union activity.

During a union [1] organizational campaign at the Hobart plant at Troy, Ohio, the union sent a letter to a substantial number of employees at their homes enclosing an authorization card and saying in part:

"You can rest assured that these cards will be handled with the strictest confidence, and your employer or foreman will have no knowledge of it."

[1] International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO.

After this letter was received by the employees, the employer replied thereto in a letter mailed to all of its employees at their homes, saying in part:

"Don't be fooled into signing misleading cards that are mailed in secrecy. It is said that when you sign such a card, no one other than a Union Representative or a respresentative of the National Labor Relations Board will ever see this card. This is not the truth. In many instances the signed card is disclosed to the Company by the Union, the NLRB, or both of them. Be careful about what you sign—don't sign ANYTHING unless you KNOW what you are signing and what it might mean to you, your family, or your fellow employees."

After hearing an unfair labor practice complaint, the Trial Examiner found that the quoted paragraph from the company letter implied a threat of reprisals for joining the union or signing a union authorization card. The NLRB adopted the Trial Examiner's findings and proposed order.

Such a threat of reprisals, if made, is a violation of law. It is a serious charge. It ought not to be inferred lightly either by an administrative agency or by a court.

In this case, the Trial Examiner, in construing the employer's letter, found:

"* * * [It] was reasonably calculated to convey to the employees that their signing of union cards would not be kept secret or confidential, that the Respondent probably would acquire knowledge of their signing cards and that Respondent would engage in reprisals against them if they signed union cards."

█ The Trial Examiner was correct only in finding that the letter was calculated to convey to the employees that their signing of the union cards would not be kept secret and that the company would probably learn about their signing the cards. He was incorrect in finding that the respondent would engage in reprisals against them if they signed the union cards. The letter contained no such statement, expressed or implied.

The finding as to threats was based entirely upon the Trial Examiner's construction of the language of the letter. There was no oral testimony of any threats of reprisals. The Trial Examiner did not state *what* reprisals, if any, were threatened. This is understandable because none is contained in the letter. The Board adopted the Trial Examiner's findings without opinion.

The dissenting opinion of Judge Edwards does not find that any "explicit" threat was contained in the letter. Indeed, he states that in general, he might tend to view the letter as containing "noncoercive, sound advice to anyone." But he further says that it should not be viewed without the critical surrounding circumstances. We agree, but the only surrounding circumstances which he points out were that a union organizing campaign was in progress; that the company's letter was signed by its president; that "it was a communication from an employer in a plant without a labor-management contract, where the employer had the immediate power to discharge and great control over his future with the company"; and that the letter was sent to the same places where the union's letters were sent, namely, to the employees' homes. It is submitted that these circumstances, singly or in their totality do not convert a non-threatening letter into a threatening one.

The dissent even questions the right of the employer to write to its employees to dispute the union's pledge of secrecy of its employees' signatures on the authorization card. The employer's letter, we submit, was the exercise of the right of freedom of speech, protected not only by the First Amendment to the Constitution but also by Section 8(c) of the Act. The employer surely had the right to reply to the union's letter and to tell its employees that contrary to the union's statements, the authorization cards are not in fact handled with the "strictest confidence", and that in many instances the signed card "is disclosed to the company

by the union, the NLRB, or both of them." For example, see N.L.R.B. v. Winn-Dixie Stores, Inc., 341 F.2d 750 (6th Cir. 1965) cert. denied, 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74.

The union in its letter told the employees:

"Many of your fellow workmen have already signed."

The company had a copy of the union's letter, which had probably been furnished to it by one of its employees. The union authorization card was in the form of a postal card that could be mailed by the employee to the union. This certainly did not entail very much secrecy.

The dissent asks what "legitimate company purpose" could be served in warning the workers that the authorization cards might not be kept secret and states that the only conceivable end served by such a warning was to imply a threat of economic reprisal. This is pure speculation since there was no evidence other than the letter. In our view, it was the union which first opened the subject of secrecy in the representation campaign it was conducting by mentioning the subject in its initial letter. The company obviously felt that the union would not adhere to its pledge of secrecy. We know of no reason why it should be prevented from communicating its views to its employees. Certainly once the union had broached the topic, the employer had the right to comment on it by way of reply.

The company's reply letter was an attempt to influence the decision of each employee by countering the union's original arguments. The early paragraphs of the company's letter emphasized its positive record during its forty-five years of existence, for work stability, job security, bonus plans, vacation benefits, and recreation facilities, all of which its employees had obtained without a union. The last paragraph, the one in dispute here, points out the other side of the company's persuasion coin. The company would have a right to advise its employees to be careful before signing the authorization cards, believing as it apparently did that union membership may well entail obligations, responsibilities, and drawbacks, which its employees should consider along with potential benefits. These could include the possibility of strikes, the requirement of paying union dues, and the possibility of involvement in union political squabbles, all of which could affect the well-being of the worker and his family.

We cannot say from the record in this case that the company had no legitimate purpose in urging its employees to be careful before signing a card. Like the union's promises of increased economic benefits, its promise of secrecy in signing cards could also be disputed by the company. After initiating this issue in its original message, the union cannot complain if the company seeks to reply thereto.

In Surprenant Mfg. Co. v. N. L. R. B., 341 F.2d 756 (6th Cir. 1965) this Court approved as non-threatening, language of the employer which was much stronger than that used in the present case. The Court in an opinion written by the late Judge Miller held that a notice to employees, posted on the company's bulletin board, containing a statement,

"Our sincere belief is that if a union were to represent you in our plant, it would not work to your benefit but to your serious harm,"

and a further statement,

"We, therefore, propose to use every proper means to prevent a union from becoming established here,"

did not constitute veiled threats as the Board contended, but were expressions of the right of free speech.

In the present case, unlike *Surprenant*, the letter did not tell the employees that serious harm would result to them if the union were to represent them, nor did the company state that it would use every proper means to prevent the union from getting established. In the total absence of any proof, it cannot be assumed here that the company would engage in unnamed reprisals against its employees if they signed union cards.

In *Surprenant,* the Court also upheld a Board finding that threats were contained in speeches made to employees by the employer's director of public relations, in which speeches he "referred to the probability that if the company did not choose to meet excessive demands of the union and a strike resulted, the company might decide to move the operation elsewhere or shut it down." This language was rather specific and, as the Court held, supported the inference or conclusion drawn by the Board that it constituted a threat. No such threat was made in the case at bar. No threats of reprisal were pointed out by the Trial Examiner. He relied on an inference which he drew solely from the language of the letter. It was wholly without basis or foundation.

■ It is true, of course, that in reviewing Board decisions, Courts of Appeals have only limited power under the terms of the Act and must uphold the Board's findings if they are supported by "substantial evidence on the record considered as a whole." However, it is important to note that the case which established the outlines of this doctrine, Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), actually was aimed at reminding Courts of Appeals that they cannot abdicate the judicial function in scrutinizing Board decisions, and called upon the Courts to set aside those decisions when—

" * * * the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." 340 U.S. 474, 490, 71 S.Ct. 456, 466.

The evidence regarding the alleged threat of reprisal in this case falls within neither of the categories mentioned in the *Universal Camera* case, supra.

■ Further, the construction of a writing is not the special expertise of the Board. Rather, it is for the Courts which have more experience and competence in construing and interpreting written instruments. We have held that the clearly erroneous rule does not prevent the Court of Appeals from construing a writing differently than the trial court's construction. Cordovan Associates, Inc. v. Dayton Rubber Co., 290 F.2d 858, 860 (6th Cir. 1961). We do not hold, as the dissent states, that this case should be reviewed de novo. Our holding simply is that the Board's construction of a writing is not sacrosanct and that we have the right, if not the duty, to correct an impermissible and unfounded inference drawn therefrom.

In this case, where the only question is whether or not the letter contained a threat within the meaning of the Act, the Court should be free to reject an improper inference drawn by the Board, particularly since what is actually involved is the legal application of the word "threat" to the letter.

Further, there is some question whether the evidence in this case is "substantial" enough to invoke the usual rule of review in the first place. In the context of an organizing campaign where union and employer are competing for the allegiance of employees, one letter, written by the employer in response to an earlier letter distributed by the union, is certainly no evidence of a plan of veiled threats. The Board itself has long held that these situations are similar to political campaigns, where wide latitude must be allowed to the participants to air charges and counter-charges. See Linn v. United Plant Guard Workers of America, Local 114, 383 U.S. 53, 60, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966).

In this case the union could well have answered the company's charge that names would be disclosed, by sending out another letter directly promising that no names would be disclosed.

The employer's constitutional right of free speech, also guaranteed under Section 8(c), should not be so easily restricted. Rather, it is up to the participants in a campaign to find and counteract any statements that they deem in-

accurate or misleading. Read against a history which involves no prior showing of anti-union activity or animus by the company and which contains absolutely no evidence of such activity in the present campaign, the letter cannot be said to amount to substantial, or even any, evidence of a threat.

Furthermore, the complaint in this case, in addition to the charge with respect to the letter, charged the company with unfair labor practice in announcing an increase in

"* * * employees' vacation benefits in order to cause employees to abandon or repudiate their union activities, sympathies and membership."

Referring to this, the Trial Examiner said:

"The General Counsel appears to contend that the timing of the events and the intertwining of the commencement of the increased benefits with the Respondent's message [letter] of opposition to the union supports an affirmative finding of the above issues."

The trouble with this contention of timing and intertwining was that the Trial Examiner then proceeded to find that there was no basis for the charge with respect to the increased benefits, and he rejected it. Hence, the two charges thereby became disentangled and the first one was deprived of the support of the second. All that was left was the bare, unsupported letter which, as we have shown, provides no foundation for the inference which the Trial Examiner drew.

Finally, the Seventh Circuit in N. L. R. B. v. Sparton Mfg. Co., 355 F.2d 523 (7th Cir. 1966) held that exactly the same language, used in a speech by the employer's general manager, did not constitute a threat of reprisal. The case at bar is much stronger than *Sparton* because in that case the decision of the Board involved the evaluation of spoken words and reactions of various listeners. There, testimony as to the surrounding circumstances of the speech and the tone of its delivery might have been crucial to its characterization, while in this case

the Court and the Board had exactly the same opportunity to view the sole piece of relevant evidence, the letter.

Considering the record as a whole, we are of the opinion that the Board's order is not supported by substantial evidence.

Enforcement is therefore denied.

EDWARDS, Circuit Judge (dissenting).

During a union organizational campaign at respondent company's plant, the union sent a letter enclosing a union representation authorization card to 300–350 employees of the company. The letter pledged that secrecy would be maintained in relation to the employee's signature on the card—particularly from the employer.

To this the company responded by a letter addressed to the home of each of its 600 employees. This letter included the following paragraph:

"Don't be fooled into signing misleading cards that are mailed in secrecy. It is said that when you sign such a card, no one other than a Union Representative or a representative of the National Labor Relations Board will ever see this card. This is not the truth. In many instances the signed card is disclosed to the Company by the Union, the NLRB, or both of them. Be careful about what you sign—don't sign ANYTHING unless you KNOW what you are signing and what it might mean to you, your family, or your fellow employees."

When an unfair labor practice complaint was filed, the Trial Examiner (and the National Labor Relations Board, by its affirmance) found as follows concerning the disputed paragraph:

"Under such circumstances the statement of Respondent in the last paragraph of its January 3, 1964, letter set out above, in my opinion, was reasonably calculated to convey to the employees that their signing of union cards would not be kept secret or confidential, that the Respondent probably would acquire knowledge of their signing cards and that Respondent would

engage in reprisals against them if they signed union cards. Such a threat constitutes a violation of Section 8(a) (1) of the Act. I so conclude and find."

My colleagues find the company's words noncoercive in themselves and hold that the NLRB did not have authority under this record and under the statute (even presumably taking into account its expertise in such matters) to infer that this language constituted a threat of economic discrimination in violation of the National Labor Relations Act.

I regret having to dissent. But it seems to me that if the rule established here ultimately prevails, it will allow great discriminatory use of employer economic power to prevent voluntary choice by employees pertaining to union membership. It was this specific evil which the NLRA was designed to eliminate.

Section 8(a) (3) (61 Stat. 140 (1947), 29 U.S.C. § 158(a) (3) (1964)) of the National Labor Relations Act prohibits discriminatory discharge.

Section 8(a) (1) (which the Board found was violated by this letter) provides:

"Sec. 8(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7; * *." 29 U.S.C. § 158(a) (1) (1964).

Section 7, of course, is the statutory grant of the right to self-organization and collective bargaining through representatives of the employee's "own choosing."

And when Congress decided to add to the NLRA a section defining the employer free speech rights, it specifically excluded from that definition the use of language which threatened the employee's freedom of choice by the employer's threat (or promise) of use of his economic power.

Section 8(c) provides:

"The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." 61 Stat. 142 (1947), 29 U.S.C. § 158(c) (1964).

The threat which the Board found in the language quoted from respondent's letter, of course, was not an explicit one. The last sentence, if taken out of context, could be regarded as noncoercive, sound advice to anyone. But this language was not viewed by the Trial Examiner or the Board without the critical surrounding circumstances.

The letter was written to employees who had just received a union authorization card and a solicitation from the union to sign and return same. It was signed by the President of the company. It followed a specific assertion that the union's pledge of secrecy was not valid, and, in effect, that the company probably would know which of its employees actually signed the union authorization cards. Most important of all, it was a communication from an employer in a plant without a labor-management contract, where the employer had the immediate power to discharge the employee and great control over his future with the company. The letter was delivered to the employee's home at the point when he was engaged in making—for him—a crucial decision as to whether or not to join the union. The letter contained no assurance of the company's intent not to discriminate against those who signed union cards. Read in the context of these critical facts, it is impossible for me to say that the Board lacked substantial evidence from which to infer that the letter constituted a threat under Section 8(a) (1) of the NLRA.

What legitimate company purpose could conceivably be served by its disputing the union's pledge of secrecy of the employee's signature? The Board found, and I think common sense tells us rightly, that the purpose of the company letter was to tell its employees that fear of

economic reprisal was a realistic one, and, hence, they should "be careful" about what they signed unless they knew what it meant to themselves and their families.

Such threats of reprisal do not have to be couched in explicit language in order to constitute an unfair labor practice. N. L. R. B. v. Monumental Life Ins. Co., 162 F.2d 340 (C.A. 6, 1947); N. L. R. B. v. Peterson, 157 F.2d 514 (C.A. 6, 1946), cert. denied, 330 U.S. 838, 67 S.Ct. 979, 91 L.Ed. 1285 (1947); N. L. R. B. v. Zimnox Coal Co., 336 F.2d 516 (C.A. 6, 1964).

This court and other Courts of Appeal upheld the Board in its inference of threat of reprisal by the use of language at least as general (if taken out of context!) as that employed here. In a discussion of union membership by company supervisors, such phrases as: "Your wife and children will suffer";[1] "[T]hey and their families might be sorry";[2] "[Employees] were 'sticking their necks out'";[3] "'[D]on't get (yourself) into trouble'";[4] "'[T]he girls would be sorry if they got the union in the plant,'"[5] have all been recognized as conveying threats of reprisal when viewed against the background facts of each case.

My colleagues cite as support for their holding N. L. R. B. v. Sparton Mfg. Co., 355 F.2d 523 (C.A. 7, 1966). The opinion in that case quotes from the disputed language there employed by a company manager in a speech to a meeting of employees as follows:

"Be careful about what you sign— don't sign anything unless you know what you are signing and what it might mean to you, your family, or your fellow employees." N. L. R. B. v. Sparton Mfg. Co., supra at 524.

While these *exact* words were employed by *Hobart* in this case, there is no reference in the *Sparton* opinion to any pre-ceding language designed to tell the employees that the company would find out who signed. Actually the Trial Examiner's opinion in the NLRB proceeding in the *Sparton* case shows that there was a sentence which somewhat less explicitly did seek to convey this same suggestion. It also indicates that both the company attorney and the Trial Examiner in the *Sparton* case were the same persons who performed the same roles in this case.

But if the Seventh Circuit was aware of the preceding sentence to the two they quoted, they neither saw fit to mention it nor sought to deal with the additionally threatening inference which it afforded.

Assuming, however, that the *Sparton* case is precedent for the view expressed here by our majority, I would have to regard it as inadequately reasoned and contrary to the weight of authority already set out above. And, of course, it is not precedent which is binding upon this Circuit.

Surprenant Manufacturing Co. v. N. L. R. B., 341 F.2d 756 (C.A. 6, 1965), is, however, another matter. It seems to me that the opinion therein by Judge Miller accurately defines the distinction between the company's right to express an opinion (even in strong language!) and the legal prohibition upon its employing even very general language to convey a threat of economic reprisal.

The opinion language which we held permissible in *Surprenant* was:

"'Our sincere belief is that if a union were to represent you in our plant, it would not work to your benefit but to your serious harm.

"'(2) We sincerely believe that the introduction of a union into our plant is not necessary or beneficial to your welfare and growth with this Company. We, therefore, propose to use

---

1. N.L.R.B. v. Zimnox Coal, supra, enforcing in pertinent part, 140 N.L.R.B. 1229, 1232 (1963).

2. Lloyd A. Fry Roofing Co. v. N.L.R.B., 222 F.2d 938, 941 (C.A. 1, 1955).

3. N.L.R.B. v. Peterson, supra, 157 F.2d at 515.

4. N.L.R.B. v. J. H. Rutter-Rex Mfg. Co., 229 F.2d 816, 818 (C.A. 5, 1956).

5. N.L.R.B. v. Dixie Shirt Co., 176 F.2d 969, 972 (C.A. 4, 1949).

every proper means to prevent a union from becoming established here.'" Surprenant Mfg. Co. v. N. L. R. B., supra at 758.

The material as to which the court in *Surprenant* upheld the NLRB's finding of an illegal threat of economic reprisal was set forth in the following paragraphs of Judge Miller's opinion:

"In his talks Gordon discussed the question of overtime and the possible loss of overtime opportunities if the union got in. He pointed out that unions do not create overtime, that overtime was completely dependent on the volume of business, and that the employees would not keep the overtime they had under existing arrangements because men would be sent home after 40 hours of work in order to avoid the 50% premium on top of the union wage scale, which Gordon referred to in his speeches as being higher than Surprenant's, but lacking Surprenant's security. The Trial Examiner found under these facts that Gordon threatened the loss of overtime if the union came in and thereby transcended legitimate persuasive efforts and engaged in interference as defined in Section 8(a) (1) of the Act. The Board concurred in this finding.

\* \* \* \* \* \*

"The finding of the Trial examiner, which was approved by the Board, was a permissible one under the circumstances under which the remarks were made, and the Board's ruling is affirmed. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456." Surprenant Mfg. Co. v. N. L. R. B., supra at 760.

The first language recited above from *Surprenant* was a plain and outspoken company expression of adverse opinion concerning labor organization, but it referred to nothing which concerned the economic power of the company nor made any threat expressed or implied of hostile use of that power. In the second quote from the *Surprenant* opinion, however, the company spokesman predicted loss of overtime, a subject clearly within its economic discretionary control and this court upheld the Board's finding that the language there employed was an implied threat and hence illegal.

In *Surprenant* this court also set forth its standard for review of such an inference:

"In such cases, if the inference or conclusion found by the Board that the statements constituted a threat is a reasonable one, which it was permissible for the Board to make, its conclusion will not be set aside on review, even though a different inference or conclusion may seem more plausible and reasonable to us. N. L. R. B. v. Superex Drugs, Inc., 341 F.2d [747,] 748, C.A. 6th, January 21, 1965. N. L. R. B. v. Marsh Supermarkets, Inc., supra, 327 F.2d 109, 111, C.A. 7th, cert. denied, 377 U.S. 944, 84 S.Ct. 1351 [12 L.Ed.2d 307]; Hendrix Manufacturing Co. v. N. L. R. B., 321 F.2d 100, 105, C.A. 5th; N. L. R. B. v. Ford, 170 F.2d 735, 738–739, C.A. 6th." Surprenant Mfg. Co. v. N. L. R. B., supra at 760.

Finally, I do not agree with the majority in our instant case that we review this case *de novo* because the claimed threats were written ones. The NLRB has a special knowledge and expertise in such matters which warrants our according its inferences the deference set forth above.

In National Labor Relations Board v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963), the Supreme Court said:

"Here, as in other cases, we must recognize the Board's special function of applying the general provisions of the Act to the complexities of industrial life. Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 798 [65 S.Ct. 982, 985, 89 L. Ed. 1372]; Phelps Dodge Corp. v. National Labor Relations Board, supra [313 U.S. 177] at 194 [61 S.Ct. 845, at 852, 85 L.Ed. 1271] and of '[appraising] carefully the interest of both sides of any labor-management controversy in the diverse circumstances of particu-

lar cases' from its special understanding of 'the actualities of industrial relations.' National Labor Relations Board v. United Steelworkers, supra [357 U.S. 357] at 362–363 [78 S.Ct. 1268] at 1271, [2 L.Ed.2d 1383. 'The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review.' National Labor Relations Board v. Truck Drivers Local Union, 353 U.S. 87, 96 [77 S.Ct. 643, 648, 1 L.Ed.2d 676]." National Labor Relations Board v. Erie Resistor Corp., supra at 236, 83 S.Ct. at 1150.

See also Republic Aviation Corp. v. N. L. R. B., 324 U.S. 793, 800, 65 S.Ct. 982, 89 L.Ed. 1372 (1945).

To me the disputed language employed in our present case was such as to make the NLRB finding of an illegal threat of economic reprisal a wholly permissible inference.

Enforcement should be granted.