**SOUTHWIRE COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 85–1787.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 4, 1986.

Decided June 12, 1987.

Walter O. Lambeth, Jr., Atlanta, Ga., for petitioner.

Patrick Szymanski, Atty., N.L.R.B., with whom Robert E. Allen, Associate General Counsel, Elliott Moore, Deputy Associate General Counsel and John Elligers, Atty., N.L.R.B., Washington, D.C., were on the brief, for respondent.

Before WALD, Chief Judge, WILLIAMS, Circuit Judge, and WILL,* Senior District Judge.

Opinion for the Court filed by Circuit Judge WILLIAMS.

WILLIAMS, Circuit Judge:

Southwire Company has petitioned for review of an order of the National Labor Relations Board finding several violations of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* (1982), and the Board has filed a cross-application for enforcement of its order.

---

* Of the United States District Court for the Northern District of Illinois, sitting by designation pursuant to 28 U.S.C. § 294(d).

Southwire operates facilities located in Carrollton, Georgia employing some 1,500 workers in the manufacture of rod, wire, and cable. In the spring of 1983, the United Steelworkers of America, AFL–CIO, began an organizational campaign at the Carrollton facilities. Union activity, including solicitation of signatures for authorization cards and wearing of union badges, was most intensive from September to December, when all the conduct at issue here occurred.

The Administrative Law Judge found that the employer conducted coercive interrogations and made threats in violation of § 8(a)(1), and that certain discharges, suspensions, and work restrictions were motivated by union activity and therefore in violation of § 8(a)(3) and (1).[1] *See Southwire Co.*, 277 N.L.R.B. No. 43 (Nov. 12, 1985). The Board accepted these findings and ordered Southwire to cease and desist from coercive interrogations, threats, and discriminatory conduct against employees supporting the union. It also provided for reinstatement of the discharged employees, make-whole relief for both the discharged and the suspended employees, cancellation of the work restrictions, correction of the records of the disadvantaged employees, and posting of a notice. *Id.* For the reasons given below, we deny Southwire's petition and grant the Board's application for enforcement.

## I. INTERROGATIONS AND THREATS

### A. *Interrogations*

■ An employer's interrogations of employees concerning union sympathies violate § 8(a)(1) if they coerce employees in the exercise of rights guaranteed by § 7 of the Act.[2] *Midwest Regional Joint Board,*

*Amalgamated Clothing Workers v. NLRB*, 564 F.2d 434, 443 (D.C.Cir.1977) [hereinafter *Midwest Regional*]. The coerciveness of an interrogation must be considered in the totality of the circumstances. *Rossmore House*, 269 N.L.R.B. 1176, 1178 & n. 20 (1984), *aff'd sub nom. Hotel Employees & Restaurant Employees Union, Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir.1985). These include the company's labor relations history, the information sought, the rank of the questioner, the place and method of questioning, and the truthfulness of the answer. *Midwest Regional*, 564 F.2d at 443. In our review of these decisions, we "must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 620, 89 S.Ct. 1918, 1943, 23 L.Ed.2d 547 (1969).

■ The ALJ specifically found § 8(a)(1) violations in two interrogation incidents occurring at the height of the unionization campaign. The first involved questioning by a plant manager of Tommy Jarrell at Jarrell's machine. The ALJ credited Jarrell's testimony that the plant manager looked at Jarrell's union badge and asked what he thought the union was going to get him. Jarrell continued:

> He was getting angry. He tried to get me to tell him, he said just name him one thing, just one thing [t]hat I thought the badge was going to get me and I told him maybe a little respect, and he told me, he said, "Well, if you are not for me and Southwire, you are on the other side of the fence."

Joint Appendix ("J.A.") at 395.

The other incident involved a supervisor's interrogation of Randall Hanson at

---

**1.** Section 8 of the Act, 29 U.S.C. § 158 (1982), provides in part:

  (a) It shall be an unfair labor practice for an employer—
  (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

    .    .    .    .    .

  (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discour-

age membership in any labor organization. . . .

**2.** 29 U.S.C. § 157 provides in part:

  Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. . . .

Hanson's machine. According to Hanson, the supervisor said, "It is all over the plant that you are for the Union, did you sign a Union card?" J.A. at 120. The supervisor went on to ask what Hanson hoped to gain from the union, and to ask, "Besides, what makes you think that this Company will deal with a Union? ... They may shut down, fire everyone who goes on strike and hire new people." *Id.* at 121.

The ALJ found that these interrogations were not "casual questioning concerning union sympathies," but rather involved a "coercive and threatening atmosphere." J.A. at 22. Considering such circumstances as Southwire's hostility to unionization and reprisals against union supporters, the focus of the questioning on whether the employees supported the union, the ranks of the interrogators, and the angry or jeering tone of the questions, we believe the Board could reasonably find that these interrogations were coercive and therefore in violation of § 8(a)(1).

B. *Threats*

■ Coercive threats by an employer regarding unionization violate § 8(a)(1). *See, e.g., Midwest Regional,* 564 F.2d at 444; *Amalgamated Clothing Workers v. NLRB,* 527 F.2d 803, 806 (D.C.Cir.1975), *cert. denied,* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976). In *Gissel Packing Co.,* 395 U.S. at 618–20, 89 S.Ct. at 1942–43, the Court determined that the employer must refrain from any coercive "threat of reprisal," *id.* at 618, 620, 89 S.Ct. at 1942, 1943, and that any prediction as to the consequences of unionization "must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control ...," *id.* at 618, 89 S.Ct. at 1942. If the "intended and understood import" of the employer's statement does not fall within this range, the statement is not protected by the First Amendment and may constitute an unfair labor practice. *Id.* at 618–19, 89 S.Ct. at 1942. *See Amalgamated Clothing Workers,* 527 F.2d at 806; *Southwest Regional Joint Board, Amalgamated Clothing Workers v. NLRB,* 441 F.2d 1027, 1032 (D.C.Cir.1970).

■ The ALJ found that Southwire made several threats to its employees in violation of § 8(a)(1). These included claims that if the union won the election, the company would close the plant and fire everyone, and that unionization would result in lower wages and loss of benefits. A supervisor told Randall Hanson that unionization might result in the elimination of his job as crew chief. This supervisor also told Hanson, "If you signed a union card and it is all over the plant that you did, you will probably never be promoted and you will have a long hard road ahead of you." J.A. at 124.

Southwire seeks to characterize these statements as "statements about the uncertainty of negotiations ... or management's lawful option of replacing economic strikers." Brief for Petitioner at 46. Instead, they conjure up a company policy of deliberate retaliation, both in employee relations generally and with special reference to union activists. They surely lack the air of predictions "carefully phrased on the basis of objective fact." *See Gissel,* 395 U.S. at 618, 89 S.Ct. at 1942. The Board could reasonably find that they fell outside the sphere of employer speech protected under *Gissel.*

■ The Board also found the following handwritten notice posted on a company bulletin board and a speech repeating some of the same language to be unlawful threats:

*BE CAREFUL WHAT YOU SIGN*

Read what the United States Court of Appeals says about Union Cards

A U.S. court of appeals upheld the following statement made by a company to its employees. Don't be fooled into signing misleading card's [sic] that are mailed in secrecy. It is said that when you sign no one other than a union Representative or a representative of the NLRB will ever see this card. This is not the truth. In many instances, the signed card is disclosed to the company by the union, the NLRB, or both of them.

Be careful about what you sign. Don't sign anything unless you know what you are signing, and what it might mean to you, your family or your fellow employee's [sic]. *NLRB v. Hobart Bros. Co.*, 372 F.2d 203 (CA6 1967)

### DON'T SIGN A CARD!

J.A. at 1037. Southwire claims that it "merely disseminated truthful and relevant information" in posting this notice. Brief for Petitioner at 48.

The Board analyzed the character of the statement in light of the surrounding circumstances. *See, e.g., J.P. Stevens & Co. v. NLRB*, 638 F.2d 676, 681, 684 (4th Cir. 1980). In adopting the ALJ's finding that the notice constituted a threat, it said:

> The speeches and notices were made against the general background of the Respondent's history of violating the Act and in the immediate context of the pervasive violations in this case, particularly those directed at open union adherents, including coercive interrogations, unlawful threats, and unlawful discharges and other retaliatory discipline. In context, the Respondent's comments are a "rather pointed hint" that it would, on learning their identity, similarly retaliate against employees who signed cards.

277 N.L.R.B. No. 43 at 2, J.A. at 75.[3] As we have seen, the "unlawful threats" comprised at least one explicitly linked to signature of a union card.

We think the Board's conclusion was reasonable. In *Hobart* itself, in a portion of the Sixth Circuit opinion that Southwire chose not to quote, the court indicated that surrounding circumstances could transform otherwise "sound advice" into an implicit threat. *Hobart Bros.*, 372 F.2d at 204; *see also J.P. Stevens & Co.*, 638 F.2d at 680–81 (recognizing significance of employer's history of § 8 violations); *NLRB v. Finesilver Mfg. Co.*, 400 F.2d 644, 646 (5th Cir.1968) (relying on context of antiunion hostility).

Southwire suggests that the union's promises of confidentiality justified its use of the *Hobart* notice. Brief for Petitioner at 48. The union had stated in a notice that "federal courts have ruled that authorization cards are confidential." J.A. at 1049. This simple statement hardly conveys the full complexity of the rules governing disclosure of authorization cards. *See Madeira Nursing Center, Inc. v. NLRB*, 615 F.2d 728, 730–31 (6th Cir.1980) (denying employer's Freedom of Information Act request for authorization cards on the basis of employees' privacy interest in the cards); *Pacific Molasses Co. v. NLRB*, 577 F.2d 1172, 1177–83 (5th Cir.1978) (same). *Cf. In re Irving*, 600 F.2d 1027, 1035–37 (2d Cir.1979) (in criminal case, trial court's refusal to quash subpoenas for authorization cards upheld, but in recognition of privacy interest only attorneys for defendants allowed to view the cards), *cert. denied*, 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979). But at worst it is misleading. While such incompleteness may be a relevant circumstance, *see NLRB v. Colony Printing & Labeling, Inc.*, 651 F.2d 502, 505–06 (7th Cir.1981), its effect here is overwhelmed by Southwire's atmosphere of hostility and menace.

Southwire also invokes *National Micronetics, Inc.*, 277 N.L.R.B. No. 95 (Dec. 9, 1985), a Board decision that followed the one reviewed here, to support its view that truth is a complete defense under § 8(a)(1). There the Board considered whether an employer's distribution of highlighted copies of one of its own opinions constituted an unlawful threat. Although the election campaign in *National Micronetics* was "marred by numerous 8(a)(1) violations," op. at 4, the Board found that the employer did not violate the Act by distributing a Board decision "merely to rebut the Union's misrepresentations," *id.* at 5. It observed, "We find that distributing accurate copies of a Board decision with portions highlighted and characterized as 'true' can

---

3. Southwire's history of violations is summarized in *NLRB v. Southwire Co.*, 801 F.2d 1252, 1253 n. 1 (11th Cir.1986), a civil contempt case arising out of events from the same union campaign at issue here but based on violations of cease-and-desist orders from five Fifth Circuit cases decided between 1963 and 1970.

in no way be construed as an illegal threat or as objectionable conduct." *Id.*

In view of the Board's failure in *National Micronetics* to discuss its own decision in the instant case, issued less than a month before by a three-member panel with two of the same Board members, we doubt that the last sentence quoted above was intended to be a *per se* Board rule universally approving the posting of excerpts from judicial decisions. It is more likely that the Board meant that the notice could not be construed as a threat in the circumstances of the case before it. Nor can it have meant to adopt a view that true statements cannot be unlawful threats. Truth is certainly a virtue, but it would not immunize an employer's statement that all employees who sign union authorization cards will be fired. *See J.P. Stevens,* 638 F.2d at 685.

## II. DISCHARGES, SUSPENSIONS, AND WORK RESTRICTIONS

The ALJ found Southwire in violation of § 8(a)(3) and (1) of the Act for discharging four of its employees—David Huckeba, Danny Ray Rowell, Arlice Smith, and Randall Hanson. Similarly, the ALJ found violations of § 8(a)(3) and (1) for the suspensions for five days of two employees—Phillip Bell and Buford Amburgey. Finally, the ALJ found these provisions violated by the company's confinement of four employees to their machines. The Board adopted the ALJ's findings in all respects. Although these cases are reviewed individually below, we begin by noting factors they all share.

■ Southwire has maintained that the discharges or suspensions resulted from application of valid company rules, rather than from antiunion animus. The Board, adopting the ALJ's findings, concluded either that the proffered justifications were pretextual or that Southwire had failed to carry its burden of demonstrating that the discipline would have been the same absent the employee's protected conduct. In determining the lawfulness of employee discipline, the employer's motivation is a crucial factor. *Midwest Regional,* 564 F.2d at 440. As this court has previously stated, "Ab-

sent a showing of anti-union motivation, an employer may discharge an employee for a good reason, a bad reason, or no reason at all without running afoul of the labor laws." *Id.*

■ Under the approach adopted by the Board in *Wright Line,* 251 N.L.R.B. 1083 (1980), *enf'd,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), and approved by the Supreme Court in *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), a discharge or suspension is an unfair labor practice only if the employee's protected conduct is a substantial or motivating factor for the action, or (as the Court preferred to put it) the action is "based in whole or in part on antiunion animus." Thus work rule violations may not be used as pretexts for firing unwelcome union activists. *Transportation Management,* 462 U.S. at 398, 103 S.Ct. at 2472. The *Wright Line* decision also guides the inquiry for the more complicated cases in which both lawful and unlawful motivations are involved. Once the General Counsel has shown unlawful motivation, the employer may still avoid an adverse determination by demonstrating that "the same action would have taken place even in the absence of the protected conduct." 251 N.L.R.B. at 1089. Thus an employee may not secure an invulnerable status merely by engaging in pro-union activities. *Cf. Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 285–86, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977).

This court may not disturb the Board's determinations if they are supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(f) (1982). *See, e.g., Universal Camera Corp. v. NLRB,* 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). We find that the record adequately supports the Board's findings of unlawful motivation in each of the following cases.

### A. *Discharges*

#### *David Huckeba*

■ David Huckeba, a Southwire employee for three years, actively supported

the union by attending union meetings and, beginning about one week before his discharge, by wearing a "volunteer organizer" union badge at work. Huckeba's supervisor testified to the high quality of his work as an electrician; indeed, about three weeks before the discharge, the supervisor recommended Huckeba for a promotion. When the promotion was denied without a clear explanation, Huckeba was upset, and told his supervisor that he was clocking out to look for another job. When the supervisor asked Huckeba if he would be back, he said he would work on his next scheduled day. Huckeba returned as promised, and was promptly notified that he was being discharged, on the grounds of violating the rule against leaving his assigned work station.

Nine months earlier, Huckeba had been disciplined with a week's suspension for damaging company property. The form he signed at that time stated that Southwire's work rules required discharge for another major rule violation within twelve months. In view of this earlier incident, the ALJ gave especially close attention to Southwire's argument that Huckeba was terminated for a rule infraction.

He nonetheless found Southwire's explanation pretextual, relying on several factors. The timing of the discharge—only about a week after Huckeba publicly indicated his support for the union by wearing the volunteer organizer badge—was one. Huckeba's good work record, which won him consideration for a promotion, also cast doubt upon the explanation. Moreover, the rule violation occurred under mitigating circumstances: Huckeba's understandable disappointment at not receiving an anticipated promotion and his conscientiousness in informing his supervisor of his early departure. The severity of the discipline indicated disparate treatment. Prior to the union campaign several other employees had left work without permission. Even where employees failed to inform anyone of their departure, the most severe penalty was an oral reprimand; the record disclosed no case of a previous discharge for such a violation. Finally, there was convincing evidence of the employer's anti-un-

ion animus in the record in connection with other violations of § 8(a)(3) and (1).

Southwire professes to see in all this "not a scintilla of evidence" supporting the determination, Brief for Petitioner at 25, perhaps referring to the want of direct evidence. But circumstantial evidence alone may establish unlawful motivation in a § 8(a)(3) case. *NLRB v. Link-Belt Co.*, 311 U.S. 584, 602, 61 S.Ct. 358, 367, 85 L.Ed. 368 (1941). Evidence of more lenient treatment of antiunion or neutral employees with disciplinary records just like Huckeba's would, of course, make an airtight case. But the law is not so demanding. Substantial evidence supports the Board's decision.

### *Danny Ray Rowell*

■ Danny Ray Rowell, a production operator with more than six years service, began attending union meetings in May 1983. After he returned from one such meeting in June, he asked his supervisor about the chances of a raise. The supervisor responded: "Well, that just depends on how strong the union is.... Southwire has people at the union. They know the names of everyone who attends the meeting." J.A. at 201–02. Rowell began wearing a "volunteer organizer" union badge in late September, one month before his discharge.

On Rowell's last day of work, he asked his shift supervisor for permission to leave work after eight hours of a scheduled twelve hour shift to get his truck repaired. The supervisor did not respond, but before leaving informed the incoming supervisor of the request. Rowell also spoke to the incoming supervisor about his need to leave early, and this supervisor also made no response. Rowell left with other employees at 3:00 p.m. When Rowell returned to work the following day, the department manager informed that he was discharged because he had left work without permission.

Southwire places considerable emphasis on a memorandum, written about a week before Rowell's discharge, instructing supervisors to inform machine operators that

they could be fired for leaving early without permission. Southwire suggests that this memorandum showed that it had no choice but to discharge Rowell. The ALJ found, however, that Southwire's explanation was pretextual. Substantial evidence supports this determination.

The ALJ based his conclusion on Rowell's previous good work record, the employer's general antiunion animus and knowledge of Rowell's union activities, and the trivial nature of the rule infraction. He noted that employees guilty of similar violations in the past had not been discharged. He found that the supervisors' failure to respond clearly to Rowell's request justified his supposing that his early departure would be tolerated, especially in view of earlier, unequivocal denials of permission.

The ALJ also rejected Southwire's suggestion that the memorandum required Rowell's discharge. Rightly so; it did not make the penalty mandatory. The same point undermines Southwire's argument that the memorandum adequately distinguishes the earlier cases where Southwire tolerated such absences.

Southwire faults the ALJ for having mistakenly relied on a finding that Rowell had never been warned about unexcused absences. Brief for Petitioner at 32. This minor error in the ALJ's opinion was harmless. Rowell's prior warning arose three years earlier out of absences caused by a motorcycle accident, and Southwire's rules themselves contain a twelve-month statute of limitations on rule violations. *See* J.A. at 1059 ("[m]ajor violations remain active for 12 months").

*Arlice Smith*

█ Arlice Smith worked for five years as a fleet attendant and trailer repairman at Southwire. Two days before his discharge, Smith began to wear a volunteer organizer badge, and his supervisor began to keep him under close observation. J.A. at 264, 267. The next day Smith had a brief discussion with a fellow employee, during which he showed the other employee his union badge and asked him to think about joining the union. The other employee complained to his superiors. Shortly thereafter, Smith's foreman told Smith that he was being discharged for violating the rule against solicitation on company premises. Smith had no record of previous disciplinary problems.

In finding that the employer's explanation for the discharge was pretextual and that the discharge was discriminatory in violation of § 8(a)(3) and (1), the ALJ relied on testimony from four witnesses indicating that the employer had tolerated solicitation in violation of the company rule on numerous occasions. Examples of such solicitation included sales of raffle tickets for a rifle, a chainsaw, a television, and a bag of groceries; collections for a high school homecoming queen and a church; and sales of knives and Girl Scout cookies. Yet there was no evidence that any employee had ever previously been disciplined, or even reprimanded, for violation of the no-solicitation rule.

It is well established that an employer may enforce a rule against solicitations during work time without violating § 8(a), as long as such enforcement is nondiscriminatory. *Restaurant Corp. of America v. NLRB,* 801 F.2d 1390, 1393–94 (D.C.Cir. 1986) [hereinafter *RCA* ]; *Midwest Stock Exchange, Inc. v. NLRB,* 635 F.2d 1255, 1270 (7th Cir.1980); *William L. Bonnell Co. v. NLRB,* 405 F.2d 593, 595 (5th Cir. 1969). In general, determinations of disparate enforcement depend on "the nature and frequency of the nonunion solicitations permitted." *RCA,* 801 F.2d at 1394.

*RCA* explored the issue of differences in "nature," holding that a conclusion of disparate enforcement must rest on a finding that the union and nonunion solicitations had "substantially equivalent potentials for disruption of work." 801 F.2d at 1394. *Cf. Hammary Mfg. Corp.,* 265 N.L.R.B. 57, 57 n. 4 (1982) (employers do not violate § 8(a)(1) "by permitting a small number of isolated 'beneficent acts' as narrow exceptions to a no-solicitation rule"). The court in *RCA* considered the disruptive potential of six nonunion solicitations—two collections for going-away gifts, two for birthday cakes, one for a going-away cake, and one

for a gift for the chef's wife, who was expecting a baby—and characterized them as "instances of intra-employee generosity designed to express appreciation of fellow employees...." 801 F.2d at 1394. The court stated, "Whatever minimal disruptive effect such solicitations may have is counterbalanced by an accompanying increase in employee morale and cohesion." *Id.* It therefore held that the solicitations were not substantially equivalent to union solicitation. *Id.*

*RCA* is distinguishable. In the instant case, the ALJ rejected Southwire's contention that the various non-union solicitations were "noninterfering," J.A. at 29, thus indicating that their disruptive potential was significant. The types and frequency of the nonunion solicitations provide substantial evidence in support of this conclusion. As the *RCA* majority noted, charitable solicitations involving outside organizations "are more like union solicitations than are solicitations that represent employees' generosity to one another." *Id.* at 1395. The solicitations on behalf of a church, the Girl Scouts and the high school homecoming queen, while doubtless involving worthy causes, could reasonably be compared to union solicitations, unlike the cake and gift collections of *RCA*. The Board could reasonably conclude that their disruptive potential was not counterbalanced by any increases in employee morale and cohesion. The same is true of the numerous raffles. The knife sales for personal profit seem even less conducive to good fellowship.

Southwire's contention that management was unaware of the nonunion solicitations is without merit. The employee who sold and traded knives during work time, known familiarly as the "knifeman," worked for the director of corporate labor relations, who was apparently consulted in the decision to discharge Smith. One employee tried to sell Girl Scout cookies to a supervisor, albeit during break time. In view of these examples, and the apparent widespread and open nature of the non-union solicitations, the ALJ could reasonably infer management awareness.

Finally, Southwire notes that Smith's solicitation triggered a complaint. The ALJ could properly regard that distinction as inadequate. Indeed, a rule based on employee sentiments toward the solicitation would be suspect, since management could easily engineer complaints. In any event, the company's no-solicitation rule makes no distinction between solicitations that inspire employee complaints and those that do not.

### Randall Hanson

■ Randall Hanson, a crew chief with a good work record through seven years of employment, spoke out in favor of the union to a supervisor eight days before his discharge. The next day another supervisor, Steve Murphy, asked Hanson if he had signed a union card, and told him that the company might shut down and fire all strikers if the union succeeded. This conversation was followed by another with Murphy, who told Hanson that if the union came in the company might eliminate Hanson's job. The next day, Murphy told Hanson that if he signed a union card he would probably never be promoted. The day after, Hanson was assigned to operate a machine for an extended period, although as crew chief he ordinarily would not have received such an assignment. Murphy told him that some supervisors thought of him as a union organizer and later told Hanson that the company had made the assignment in order to immobilize him. When Hanson was criticized for not properly cleaning under the machine at the end of the shift, he told Murphy that he was giving notice.

Nevertheless, Hanson returned for his next scheduled shift later that same day and tried to withdraw his resignation. His department head responded with a short lecture on the importance of loyalty to the company ("There is no middle ground here.... I expect my employees to be loyal to me and to Southwire one hundred percent." J.A. at 137) and told him that his resignation had been accepted. Hanson wore a volunteer organizer badge to work on his last day, and Murphy told him that wearing the badge was a serious mistake.

The ALJ concluded that Hanson was singled out because of his support for the union, interrogated and threatened in violation of § 8(a)(1), given a discriminatory job assignment to restrict his movement in violation of § 8(a)(3) and (1), and in effect discriminatorily discharged when he was not permitted to withdraw his resignation. He relied on testimony showing that other employees in the past had been permitted to withdraw their resignations. Southwire maintained that it had filled Hanson's position within a few hours of his resignation. In one of the instances considered by the ALJ, however, the employee's job was filled, but the employee was allowed to work temporarily in another job before resuming his old one. The person hired to replace Hanson was a current employee, so an opening necessarily remained. Moreover, a company supervisor admitted that in such circumstances an employee would normally be allowed to withdraw his resignation and move to the job created.

Southwire notes that a supervisor told Hanson, "[I]f you want to, you can fill out another application," J.A. at 143, and styles this remark an "encourage[ment] to reapply with the Company," Brief for Petitioner at 41. To us, the remark hardly sounds encouraging, much less equivalent to the firm's apparent treatment of other temporary quits.

Finally, the distinctions urged by Southwire between Hanson and those allowed to resume work on their shift or in their old department are not so compelling as to undermine the ALJ's finding of discriminatory treatment.

### B. *Suspensions*

#### *Phillip Bell*

■ Phillip Bell was a machine operator who received a five-day suspension ostensibly for violating the company rule against falsifying records. Bell was an early union supporter who wore a volunteer organizer badge regularly during the campaign. He testified that his supervisor reacted to his open union support by keeping an unusually close watch over him and not allowing others to talk to him. Another employee testified that this same supervisor told him that a company vice-president had pressured the supervisor to find some pretext for firing Bell, causing the supervisor to search Bell's records. J.A. at 401; *see also id.* at 1038 (employee's contemporaneous notes concerning conversation).

Bell's rule infraction involved accounting for the wire his machine produced and for die changes in a way that artificially improved his production figures. Bell did not deny the charge, but he maintained that other operators used these same methods. Other machine operators corroborated this, and one said that all the other operators used these methods. J.A. at 421–22, 477–78, 551. Yet there was no evidence of any previous discipline for this offense. One employee, also a union supporter, was threatened with suspension for falsifying time cards with regard to die changes but ultimately escaped with only a warning. Within a week or two after Bell's suspension, management held a special meeting to clarify and stress proper recording procedures—the first such effort in the recollection of at least two of the employees who reported it.

The ALJ recognized that the company had a legitimate concern in halting the accounting offenses admittedly committed by Bell, but still determined that Bell was disciplined for his union activity rather than his rule violation. Substantial evidence supports the finding. In light of the evidence of illicit motive, the ALJ and the Board could reasonably find that Southwire failed to satisfy its burden of showing that it would have taken the same action even in the absence of Bell's union activity. *See Wright Line*, 251 N.L.R.B. at 1089; *Transportation Management Corp.*, 462 U.S. at 401, 103 S.Ct. at 2474.

Southwire seeks to represent a production accounting error of Bell's from a year or so before the events here at issue as a previous "misuse of the incentive pay system" for which "he was reprimanded," Brief for Petitioner at 33, perhaps with a view to tarring Bell as a recidivist. In any event, such characterization is misleading. This earlier incident did not even involve a

formal disciplinary warning, but only an informal note asking him to change his practice in the future. *See* J.A. at 441–42. There is no indication, even in testimony from Southwire's own witness, *see* J.A. at 775–76, that the error was anything but an honest mistake. Finally, Southwire does not dispute (although it dismisses as irrelevant) that the financial gains from any of Bell's calculations would have been insignificant. Brief for Petitioner at 35. In sum, Southwire's argument in no way undermines the findings of the Board.

*Buford Amburgey*

A shift superintendent accused Buford Amburgey of swinging on the control cable of a hoist, in violation of company safety rules, and the company suspended him for one week. Amburgey admitted only that he had mimed a monkey climbing a tree—behavior consistent with his reputation as something of a clown. He denied that his feet ever left the ground or that he had placed any weight on the cable. Another witness, much closer to the episode than the superintendent, essentially backed Amburgey's account. The ALJ believed them, and Southwire adduces no compelling reason to overturn the finding. *See Conair Corp. v. NLRB*, 721 F.2d 1355, 1367–68 (D.C.Cir.1983), *cert. denied*, 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 819 (1984).

Of course a supervisor can make mistakes without triggering a company violation of § 8(a)(3) and (1). But the record suggests more than honest error. Amburgey had worked for Southwire for more than five years without ever receiving formal discipline. He was an active union supporter and wore a volunteer organizer badge. He had been confined to his work area under conditions strongly supporting an inference of retaliatory purpose—the subject of a separate unfair labor practice finding discussed in the next section.

Substantial evidence thus supports the ALJ's findings that Southwire acted out of antiunion animus and that it failed to show that Amburgey would have been penalized in the absence of such motivation.

### C. *Work Restrictions*

Otherwise valid work restrictions enforced in a discriminatory manner, like discriminatory discharges or other discipline, may violate § 8(a)(3) and (1). *See, e.g., McGraw-Edison Co. v. NLRB*, 533 F.2d 1266, 1268 (D.C.Cir.1976). The Board adopted the ALJ's findings of violations with regard to four employees—Buford Amburgey, Nelson Dowdy, Randall Vance, and Tommy Jarrell—who were confined to their machines and not permitted to talk to other employees.

Although Southwire argued that it was merely enforcing its company rules in limiting the union-adherents' movements and interaction with fellow employees, the ALJ found that the rule was being discriminatorily enforced. Substantial evidence supports this finding. Indeed, Amburgey testified that when he asked the reason for his being restricted, his supervisor nodded toward Amburgey's volunteer organizer union badge and said, "That is why." J.A. at 338. Southwire's objections to the ALJ's findings, to the extent they are not simply misstatements of the evidence, essentially turn on issues of credibility, and we see no reason not to defer to the ALJ's determinations here. *See, e.g., Conair Corp.*, 721 F.2d at 1367–68.

### III. BIAS OF THE ALJ

Southwire also contends that the ALJ's bias and hostility denied it a fair trial. We have carefully reviewed the trial transcript excerpts that Southwire cites in support of this contention and determined that it is meritless.

### CONCLUSION

In sum, we find the Board's order adequately supported by substantial evidence on the whole record in all respects. We therefore grant the Board's application for enforcement.

*It is so ordered.*