ELASTIC STOP NUT DIVISION OF
HARVARD INDUSTRIES,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Local 726, United Automobile, Aerospace
and Agricultural Implement Workers
of America, Intervenor.

No. 89–1723.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 27, 1990.

Decided Dec. 11, 1990.

Avrum M. Goldberg, with whom Victoria A. Higman was on the brief, for petitioner.

Richard A. Cohen, Atty., N.L.R.B., with whom Howard E. Perlstein, Supervisory Atty., and Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., were on the brief, for respondent.

Thomas J. Giblin and James J. Marchwinski were on the brief, for intervenor.

Before WALD, Chief Judge, RUTH BADER GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

This litigation arises from events surrounding Harvard Industries' ("Harvard") purchase of the Elastic Stop Nut Division ("ESND") of Amerace Corporation. The case is before us on a petition to review an order of the National Labor Relations Board ("NLRB" or "Board") finding Elastic Stop Nut Division of Harvard Industries in violation of sections 8(a)(1), 8(a)(3), and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 151 et seq. (1988) ("NLRA" or "Act"), for failing to rehire all of ESND's former work force because of anti-union animus, dismissing workers engaged in an unfair labor practice strike, and refusing to bargain with the ESND employees' former union. The Board has cross-petitioned for enforcement of its order. Local 726 ("Un-

ion"), the collective bargaining representative of the employees of Amerace, Harvard's predecessor, has intervened on behalf of the Board.

For the reasons set forth below, we affirm the Board's decision and accompanying order.[1]

## I. BACKGROUND

### A. Factual Summary

#### 1. *Harvard's Preparations for the Acquisition*

Elastic Stop Nut Division of Harvard Industries has been in the business of manufacturing metal fastening devices for more than forty years. Initially an independent company, Elastic Stop Nut was purchased by Amerace Corporation in 1968. Amerace continued to operate Elastic Stop Nut's principal manufacturing concern in Union, New Jersey and, in 1973, added a second Elastic Stop Nut plant in Pocohontas, Arkansas, which—except for a brief period of time—has been non-union.

In June, 1984, Amerace entered into a new collective bargaining agreement with Local 726, the exclusive bargaining agent for workers at the New Jersey plant. The agreement was to be effective through May 30, 1986, and purported to bind, not only the parties themselves, but also "their successors and assigns."

According to testimony offered by Gary Anderson, the Division Controller of Elastic Stop Nut, Amerace began looking for a potential purchaser for the company in 1984. By July of that same year, Harvard had engaged in serious negotiations with Amerace to purchase Elastic Stop Nut. Harvard is a corporate conglomerate in the business of acquiring other companies for growth purposes. In previous acquisitions of companies with unionized work forces, Harvard always has hired its predecessor's work force, has recognized the existing union, and has negotiated with the union for changes in any collective bargaining agreements.

Before Harvard agreed to buy Elastic Stop Nut, it extensively evaluated Elastic Stop Nut's operations. Harvard hired James Duke, a former Elastic Stop Nut president, and Arthur Anderson & Co., a business consulting firm, to evaluate Elastic Stop Nut's operations. In addition to recommending organizational changes and certain capital outlays, Arthur Anderson recommended that Harvard hire an entirely non-union work force at the New Jersey plant and ultimately merge its operations with the Arkansas plant.

In early March, in anticipation of the likely acquisition, Elastic Stop Nut President James Kerestes ordered the New Jersey plant managers to evaluate the bargaining unit employees. No such order was given for non-union employees, however, nor were evaluations conducted in the other Elastic Stop Nut plant.

Each employee was to be evaluated twice: once by his or her own supervisor and once by Elastic Stop Nut's personnel department under the direction of William Tehanchuk. Each evaluator was to rate the employees on the basis of a one-to-ten scale; the two ratings would then be averaged for a final, composite score. The line supervisors apparently were instructed not to consider an employee's union sympathies in making their ratings.

However, Tehanchuk, in directing the personnel department, was instructed to consider an employee's union sympathies in making his evaluations. In 150 instances, the personnel department rated employees lower than the employees' supervisors did. In 48 of the 150 instances, when the personnel department's lower rating was averaged with the supervisor's higher rating, the overall rating lowered the employee below minimally acceptable status. Although thirty employees actually received higher ratings from the personnel department than from their supervisors, in most of those cases the combined ratings still resulted in the employee being rated below the minimally acceptable grade.

---

**1.** Reported as *Elastic Stop Nut Division of Harvard Industries, Inc. and Local 726, United Auto-* *mobile, Aerospace and Agricultural Implement Workers of America,* 294 N.L.R.B. No. 88 (1989).

In addition to the individual employee evaluations, Stuart Coleman, Harvard's Vice President, instructed an Elastic Stop Nut operations manager to prepare a list of bargaining unit employees who were essential to the operation of the plant. This relatively small group of people consisted mostly of foremen or skilled workers. No such list was made for salaried workers, however; Harvard retained virtually all of these employees. Richard Mason, an Elastic Stop Nut plant manager under Amerace, also testified that Coleman confirmed that Harvard would commence operations union free.

### 2. *Harvard's Acquisition of Elastic Stop Nut*

On March 29, 1985, Harvard entered into a purchase agreement for the assets of Elastic Stop Nut with Amerace and hired Duke as the acting president of the new company. The effective take-over day was scheduled to be April 12, 1985. On Monday, April 8, Harvard posted a notice to bargaining unit employees stating that they could apply for employment with the re-opened ESND between April 8 and 12. Harvard informed virtually all non-bargaining unit employees that they could continue working for ESND.

On April 9, Union representatives met with Harvard's labor attorney, Donald Bush, asking him if Harvard intended to recognize the Union. Bush indicated that his law firm had promised Harvard a union-free environment. Although the Union stated that it was willing to bargain, Bush informed the Union representatives that Harvard would not assume the prior labor agreement. According to a Union representative's testimony, Bush added that Harvard would not hire more than 50% of the unionized labor force.

Harvard Vice President Coleman then assembled a hiring team to consider the bargaining unit applicants. Coleman told the team that Harvard intended to hire no more than 25% of the current bargaining unit employees to insure that Harvard avoided the Union. Coleman emphasized that the hiring team should avoid union-ori-

ented applicants and that the only ESND Amerace applicants who should be considered were those who were highly skilled or exceptionally fine employees.

On Friday, April 12—the last official day of hiring—the Union sent Harvard a letter applying for jobs on behalf of all 242 former Elastic Stop Nut bargaining unit employees. By the close of business that same day, 221 Union members had made individual applications to Harvard. Harvard offered only sixty-eight Amerace bargaining unit employees jobs. With few exceptions, those Amerace bargaining unit employees hired by Harvard were highly skilled personnel, essential to plant operations. In addition, Harvard hired seventy-five employees not previously employed by Amerace, hence, not members of the former bargaining unit.

As of the date of the Board's hearing, Harvard operated the plant without substantial changes—the work force remained approximately the same size, the product lines were the same, as were the suppliers, raw materials, customers, and machinery. The plant's management also remained largely intact. The principal changes Harvard made were in the increased use of outside contractors and part-time employees and the consolidation of job classifications. Thus, Harvard operated the plant much the same way it had operated under Amerace.

### 3. *The Strike*

On Sunday, April 14, the Union held a meeting at which a strike vote was taken. The Union voted to strike, taking the position that no one should go back to work unless Harvard rehired all former Elastic Stop Nut Union employees. Picketing commenced the next day, and nearly all former Elastic Stop Nut employees who had subsequently accepted employment offers from Harvard failed to report to work. Harvard initiated a telephone campaign to convince striking employees to come to work. After the failure of the telephone campaign, Harvard sent a letter to forty-one of the strikers stating that it considered the workers to have voluntarily resigned and/or been

replaced. Some two weeks later, on May 21, Harvard sent a letter to fourteen more of the striking employees "confirming" the fact that they "voluntarily" had decided not to accept employment with Harvard. The letters invited the workers to re-apply with Harvard in the future. The recipients of these letters continued to strike and Harvard continued to advertise for replacement workers.

## B. The Board's Legal Conclusions

The Board found, in affirmance of the ALJ, that Harvard violated sections 8(a)(3) and (1) of the Act by refusing to make employment offers to nearly three quarters of the former Elastic Stop Nut Union employees in order to avoid bargaining with the Union and by discharging fifty-five former Elastic Stop Nut Union members who, after accepting job offers with Harvard, then engaged in an unfair labor practice strike.[2]

The Board also found that Harvard was a successor corporation to Amerace and that Harvard violated sections 8(a)(5) and (1) of the Act by failing to recognize and bargain with the Union and by unilaterally changing pre-existing rates of pay and benefits.

## II. ANALYSIS

Under the NLRA, we may not disturb the Board's findings of fact when those findings are supported by substantial evidence based upon the record taken as a whole. *See* 29 U.S.C. § 160(e) (1988); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 463–64, 95 L.Ed. 456 (1951); *NLRB v. Gateway Theatre Corp.*, 818 F.2d 971, 974 (D.C.Cir.1987). If there is substantial evidence to support the Board's findings, we will uphold the Board's decision even if we would have reached a different conclusion had we considered the question *de novo. St. Agnes Medical Center v. NLRB*, 871 F.2d 137, 144 (D.C.Cir.1989). In the present case, we conclude that the Board's findings of fact are supported by substantial evidence

based upon the record considered as a whole. Its legal conclusions are supported by its findings, and are not arbitrary or capricious. Therefore, we affirm the Board's judgments and remedies.

## A. Findings of Unfair Labor Practice

### 1. *The Failure to Hire Elastic Stop Nut's Former Work Force*

An acquiring employer has the right to operate its business in the manner in which it best sees fit. *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 287–88, 92 S.Ct. 1571, 1582–83, 32 L.Ed.2d 61 (1972). A potential employer might be willing to assume a moribund or marginally profitable business "only if he can make changes in corporate structure, composition of the labor force, work location, task assignment, and the nature of supervision." *Id.* Consistent with this right to reorganize an acquired business, "nothing in the federal labor laws 'requires that an employer ... who purchases the assets of a business be obligated to hire all of the employees of the predecessor....' " *Howard Johnson Co. v. Detroit Local Joint Executive Board*, 417 U.S. 249, 261, 94 S.Ct. 2236, 2243, 41 L.Ed.2d 46 (1974) (quoting *Burns*, 406 U.S. at 280 n. 5, 92 S.Ct. at 1578 n. 5).

However, while the acquiring company need not accept its predecessor's contract, it is bound to bargain with the incumbent union. *Esmark, Inc. v. NLRB*, 887 F.2d 739 (7th Cir.1989). Though the Supreme Court in *Burns* was careful to safeguard "the rightful prerogative of owners independently to rearrange their businesses," *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 182, 94 S.Ct. 414, 424, 38 L.Ed.2d 388 (1973) (quoting *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 549, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964)), including the decision whether or not to hire the predecessor corporation's work force, the acquiring company may not discriminate against union employees in its hiring. *Fall River Dyeing & Finishing*

---

**2.** Harvard concedes that if its refusal to hire the other former Amerace employees was an unfair labor practice, then the strike was an unfair labor practice strike.

*Corp. v. NLRB,* 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987); *accord Howard Johnson Co.,* 417 U.S. at 262 and n. 8, 94 S.Ct. at 2243 and n. 8.

■ Section 8(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3) (1988). The statute requires proof that union members have been accorded different treatment—and that that treatment will likely discourage (or in some cases, encourage) participation in a union. *Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 698, 103 S.Ct. 1467, 1471–72, 75 L.Ed.2d 387 (1983).

■ Congress, however, did not intend to prohibit all actions that might have an effect on union participation. *Id.* Congress's intent "was to forbid only those acts that are motivated by an anti-union animus." *Id.* at 700, 103 S.Ct. at 1473 (citations omitted). Indeed, the Supreme Court has noted that "otherwise legitimate actions may constitute unfair labor practices" if anti-union animus is found. *Metropolitan Edison,* 460 U.S. at 701, 103 S.Ct. at 1473 (citations omitted). Thus, the mere failure to hire a union member, by itself, does not rise to the level of a section 8(a)(3) violation; anti-union animus on the part of an employer is a necessary element of any such violation. If the failure to hire a union member results from legitimate business considerations and is otherwise free of anti-union animus, the employer has not violated the NLRA. *NLRB v. Bausch and Lomb, Inc.,* 526 F.2d 817, 821 (2d Cir.1975). The question for the Board to consider is "whether the employer's actions are motivated by anti-union considerations." *Teamsters Local Union No. 171 v. NLRB,* 863 F.2d 946, 955 (D.C.Cir.1988) (quoting *NLRB v. Berger Transfer and Storage Co.,* 678 F.2d 679, 691 (7th Cir.1982)). Motive is a question of fact, *Southwire Co. v.*

*NLRB,* 820 F.2d 453, 459 (D.C.Cir.1987), and the Board may consider both circumstantial and direct evidence in determining an employer's intent. *NLRB v. Link–Belt Co.,* 311 U.S. 584, 597, 61 S.Ct. 358, 365, 85 L.Ed. 368 (1941). We apply the substantial evidence test in reviewing the Board's determination of intent. *Southwire,* 820 F.2d at 459.

■ In the present case, substantial evidence exists to demonstrate that Harvard's actions were motivated by a desire to avoid bargaining with the former employees' Union. The Board found that Harvard violated sections 8(a)(3) and 8(a)(1) of the Act by refusing to hire the former Amerace employees simply because they were Union members. The Board based its decision on statements made by Harvard's management and its dissimilar treatment of non-union employees at both the New Jersey and Arkansas plants. Harvard asserts, however, that the Court should reject the Board's holding because Harvard had legitimate economic reasons for making its employment decisions. Thus, Harvard argues that this case is one of mixed motive and that the Board should have applied the traditional *Wright Line* [3] analysis for reviewing cases of mixed motive, which it failed to do.

The *Wright Line* test, simply stated, requires that once the General Counsel has established a *prima facie* case of an adverse employment action based on anti-union animus, the employer may still establish by a preponderance of the evidence that it would have taken the action regardless of the existence of such animus. *See Passaic Daily News v. NLRB,* 736 F.2d 1543, 1552–53 (D.C.Cir.1984). Thus, under *Wright Line,* a legitimate business purpose may provide a defense even in the face of anti-union animus.

In the present case, however, it is clear that the General Counsel established its *prima facie* case and that the company failed to meet its rebuttal burden under

---

**3.** The *Wright Line* test, first enunciated in *NLRB v. Wright Line,* 251 N.L.R.B. 1083 (1980), *enforced,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848

(1982), was upheld by the Supreme Court in *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983).

*Wright Line.* Substantial evidence does exist that Harvard opposed Union membership at ESND and kept its hiring of Union members to an absolute minimum to avoid dealing with the Union. The ALJ credited Mr. Tehanchuk's testimony that Harvard instructed him to limit the hiring of former Union members to no more than 25% of the new employee complement.[4] The ALJ also relied on testimony stating that Harvard would not recognize the Union or any prior collective bargaining agreements. The Court must uphold Board-approved credibility determinations of an ALJ unless they are "hopelessly incredible" or "self-contradictory." *Conair Corp. v. NLRB,* 721 F.2d 1355, 1368 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 819 (1984); *accord Teamsters Local 171 v. NLRB,* 863 F.2d at 953. The ALJ also found that Harvard rehired virtually all of its predecessor's non-union employees. These findings are clearly sufficient to establish a *prima facie* case that anti-union considerations were a motivating factor in Harvard's employment decisions. Under the *Wright Line* test, once the General Counsel made this showing, the burden then shifted to the company to prove that it would have taken the same actions even in the absence of anti-union animus. In view of the findings the Board adopted from the ALJ that "but for" the anti-union animus Harvard would have rehired the former work force in its entirety, we conclude that the Board properly found that Harvard failed to establish a *Wright Line* defense. As the Supreme Court observed in *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 403, 103 S.Ct. 2469, 2475, 76 L.Ed.2d 667 (1983):

> The employer is a wrongdoer; he has acted out of a motive that is declared illegitimate by the statute. It is fair that he bear the risk that the influence of legal and illegal motives cannot be separated, because he knowingly created the risk and because the risk was created not by innocent activity but by his own wrongdoing.

Although it is well-settled law that "we may not supply a reasoned basis for agency action that the agency itself has not given," *RKO General, Inc. v. FCC,* 670 F.2d 215, 221 (D.C.Cir.1981), we "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (quoting *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). Although we would have expected a clearer exposition of the Board's rejection of Harvard's *Wright Line* defense, it is clear that the Board rejected Harvard's attempt to establish that a legitimate business purpose would have resulted in the same hiring practices absent anti-union animus.

Thus, we hold that the Board had substantial evidence upon which to find that Harvard committed an unfair labor practice in refusing to hire the former Union employees of Elastic Stop Nut.

## 2. *Refusal to Bargain with the Union*

 Section 8(a)(5) of the Act makes it an unfair labor practice for an employer to refuse to bargain collectively with the representatives of its employees as defined in section 9(a) of the Act, 29 U.S.C. § 159(a), which confers exclusive representative status upon a union selected by a majority of the employees of the appropriate bargaining unit. When a new owner acquires a business and makes no significant change in its essential nature and a majority of the new owner's employees were employed by the predecessor, the new owner acquires a duty to recognize and bargain with an incumbent union representing its predecessor's employees. *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. at 37, 107 S.Ct. 2225, 2232–33, 96 L.Ed.2d 22. The collective bargaining obligations of a successor employer derive from both the statutory mandate of section 9(a) and from a recognition that " 'a mere change of employers or of ownership in the employing industry' " will not destroy the presump-

---

**4.** By the end of the hiring period, Harvard had, in fact, hired only about 27% of former Ame- race employees who were Union members.

tion of continuing employee support for a certified or voluntarily recognized union. *Id.* at 37, 107 S.Ct. at 2233 (quoting *Burns,* 406 U.S. at 279, 92 S.Ct. at 1577). But an acquiring company need bargain with the predecessor employees' union *only* when that union constitutes more than 50% of the new bargaining unit. *International Association of Machinists & Aerospace Workers v. NLRB,* 595 F.2d 664, 670 n. 29 (D.C.Cir.1978), *cert. denied,* 439 U.S. 1070, 99 S.Ct. 839, 59 L.Ed.2d 36 (1979).

Further, "nothing in the federal labor laws 'requires that an employer ... who purchases the assets of a business be obligated to hire all of the employees of the predecessor....'" *Howard Johnson Co. v. Detroit Local Joint Executive Board,* 417 U.S. at 261, 94 S.Ct. at 2243, 41 L.Ed.2d 46 (quoting *Burns,* 406 U.S. at 280 n. 5, 92 S.Ct. at 1578 n. 5). Harvard, therefore, claims that it was within its rights in not hiring all of Amerace's employees and in subsequently refusing to recognize the Union because Union members constituted a minority of the ESND work force. *See, e.g., Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 184 n. 6, 94 S.Ct. 414, 425 n. 6, 38 L.Ed.2d 388 (1973) ("[B]ecause the purchaser is not obligated by the Act to hire any of the predecessor's employees [citing *Burns* ] the purchaser, if it does not hire any or a majority of those employees, will not be bound by an outstanding order to bargain issued by the Board against the predecessor or by any order tied to the continuance of the bargaining agent in the unit involved [citing *Burns* ].").

■ However, a successor employer violates the Act by refusing to bargain with the union that had represented its predecessor's employees—even though the union does not represent a majority of the current work force—if the successor prevented the union from securing a majority by unlawfully discriminating against the predecessor's employees in hiring the new work force. *International Association of Machinists & Aerospace Workers v. NLRB,* 595 F.2d at 667; *Foodway of El Paso Div. of Kimbell Foods, Inc.,* 201 N.L.R.B. 933 (1973). The Board's finding that Harvard violated sections 8(a)(5) and (1) of the Act by refusing to recognize and bargain with the Union derives from its finding that Harvard violated sections 8(a)(3) and (1) by not hiring all former Elastic Stop Nut Union employees. Although Harvard claimed it refused to bargain with the Union because of a good faith belief that Union members would be in the minority in the new work force, the Board found that absent Harvard's refusal to hire them, the former employees would have constituted a majority of Harvard's employee complement, and consequently, Harvard was obligated as a successor employer to recognize and bargain with their Union. *Burns,* 406 U.S. at 279, 92 S.Ct. at 1577–78.

In upholding the Board's finding that Harvard violated sections 8(a)(3) and (1) by refusing to hire the former Elastic Stop Nut employees, we also affirm the Board's finding that Harvard violated section 8(a)(5) by refusing to negotiate with the Union.

### 3. *Dismissal of the Striking Workers*

■ An employer violates sections 8(a)(3) and (1) of the Act by dismissing employees for engaging in protected union activities. *NLRB v. International Van Lines,* 409 U.S. 48, 93 S.Ct. 74, 34 L.Ed.2d 201 (1972); *Elam v. NLRB,* 395 F.2d 611, 614 (D.C.Cir. 1968). No formal discharge is required if the words or conduct of the employer would reasonably lead an employee to believe that he had been fired. *Pennypower Shopping News, Inc. v. NLRB,* 726 F.2d 626, 630 (10th Cir.1984).

■ Because we already have determined that Harvard's refusal to hire the previous Elastic Stop Nut work force and bargain with the Union constituted an unfair labor practice, there can be no dispute that the Elastic Stop Nut workers, in protesting Harvard's refusal to hire the entire work force, were engaged in protected strike activity within the meaning of the Act. *See NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 15, 82 S.Ct. 1099, 1103, 8 L.Ed.2d 298 (1962). The question presented here is whether Harvard commit-

ted an unfair labor practice by causing the employees reasonably to believe that they were dismissed as a result of their protected strike activity and that their continued employment was conditioned on abandoning the strike.

We hold that there is substantial evidence in the record as a whole to support the Board's findings that Harvard's actions led the employees reasonably to believe that Harvard had dismissed them because of their participation in an unfair labor practice strike. As the Board stated in *Ridgeway Trucking Co.*, 243 N.L.R.B. 1048, 1048–49 (1979):

> The test for determining "whether [an employer's] statements constitute an unlawful discharge depends on whether they would reasonably lead the employees to believe that they had been discharged" and "the fact of discharge does not depend on the use of formal words of firing.... It is sufficient if the words or actions of the employer would logically lead a prudent person to believe his tenure has been terminated."

(Footnotes and citations omitted). Thus, the objective test is whether the employee could reasonably believe that he had been fired.

On May 8, Harvard sent a letter to forty-one employees stating that their employment status was being "changed immediately to reflect the fact that you have voluntarily resigned and/or have been permanently replaced." Joint Appendix ("J.A.") at 1037. On May 14 and May 23, Harvard sent additional letters to fourteen more striking employees that also indicated Harvard considered the workers to have "voluntarily resigned." J.A. at 1346, 1347. The Board found that neither of these assertions were true; rather, the employees were continuing to strike in protest of Harvard's unfair labor practices. Furthermore, the letters specifically informed the employees that they could contact Harvard if they wished "to be considered for employment in the future." *Id.* This statement clearly evinces an understanding that the employees were terminated. Thus, the language of the letters themselves easily

supports the Board's finding that Harvard discharged these employees, and did so because of their refusal to abandon the strike and return to work.

Our conclusion is not altered by Harvard's claim that it did not violate the Act because its letters were designed "to encourage employees to come to work" (Petitioner's Brief at 44) or that it effectively terminated the cancellation notices by "[telephoning] the strikers after the letters were sent [and] ... requesting them to return to work." J.A. at 21. Although an employer's subsequent actions may evince an intent not to discharge employees, *see Matlock Truck Body & Trailer Corp.*, 217 N.L.R.B. 346, 348–49 (1975), we accept the Board's contrary conclusion that Harvard caused the employees reasonably to believe that they had been discharged as a result of their strike activity. The company's actual intent is not determinative if "its words or actions ... would logically lead a prudent person to believe his tenure had been terminated." *Ridgeway Trucking Co.*, 243 N.L.R.B. 1048, 1049 (1979); *see also Conair Corp.*, 261 N.L.R.B. 1189, 1189–90 (1982) *modified*, 721 F.2d 1355 (D.C.Cir.1983). The Board not only found that Harvard's witnesses were unable to indicate the precise dates of the alleged phone conversations, but also failed to identify any individuals with whom they allegedly spoke. J.A. at 690, 753–54. Thus, the Board drew reasonable inferences from the evidence before it that Harvard made no attempt to negate the inference of discharge created by the letters it sent striking employees.

## B. The Remedy

Harvard also argues that the Board exceeded its authority in its remedial order. That remedial order requires Harvard to cease and desist from its unfair labor practices; affirmatively, to offer full reinstatement to every former Amerace–ESND employee with backpay based upon the rates paid immediately prior to Harvard's acquisition of ESND; to reinstate all the former ESND employees whom it terminated while on strike; and to provide the strikers backpay from the time of the receipt of their

"discharge letter" to the present. Finally, the order requires Harvard to post appropriate notice of these orders to all employees. Harvard contends that the evidence before the Board did not support the remedies ordered, especially the reinstatement of all former employees.

■ As an initial matter, we must determine whether Harvard's challenge that the Board's remedy is overbroad and punitive is barred by section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e). Section 10(e) provides:

> No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.

This section is intended to further "the salutary policy ... of affording the Board [the] opportunity to consider on the merits questions to be urged upon review of its order." *Marshall Field & Co. v. NLRB*, 318 U.S. 253, 256, 63 S.Ct. 585, 586, 87 L.Ed. 744 (1943). Or, as the Supreme Court later put it, section 10(e) is an example of Congress's recognition that because of the need for "orderly procedure and good administration[,] ... courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952).

Hence, we must determine whether Harvard's exceptions placed the Board on notice that the remedy was being questioned. As we have previously noted, "the critical inquiry is whether the objections made before the Board were adequate to put the Board on notice that the issue might be pursued on appeal." *Consolidated Freightways v. NLRB*, 669 F.2d 790, 794 (D.C.Cir.1981).

In this case, Harvard failed to make proper objection before the Board to preserve on appeal the remedies issue. Nowhere in its exceptions to the ALJ's recommendations did Harvard specifically object

to the remedy imposed. In its reply brief, Harvard asserts that it "plainly put the Board on notice of its objection in this regard by stating on page 1 that the administrative law judge had erred by 'imposing ... the following obligation[ ]: ... to offer employment *to each and every* one of the 242 bargaining unit employees that constituted the former employer's work force....' " Reply Brief for Petitioner at 20 n. 8 (emphasis supplied in Reply Brief) (citations omitted). In support of this argument Harvard cites *Consolidated Freightways*, 669 F.2d at 794, where we ruled that "issues implicated by an imprecisely drafted objection" but made evident by the context are not shielded from Board review. However, that decision is of no help to Harvard in the present case.

In *Consolidated Freightways, supra,* we determined that petitioner had adequately placed the Board on notice that it intended to raise an issue concerning the tolling of backpay liability. That petitioner, in its exceptions to the ALJ's recommendations, "specifically objected to [the ALJ's] failure to find '[t]hat the Charging Party refused the May 1, 1979 offer of reinstatement *because* it did not include an offer of backpay....' " *Consolidated Freightways*, 669 F.2d at 794 (emphasis supplied in case) (citation omitted). Furthermore, that petitioner made clear in its brief to the Board in support of its exceptions that it was taking exception to the ALJ's finding. The Board and the ALJ also specifically addressed petitioner's arguments in their decisions. *Id.* at 795. This enabled us to determine that the Board had been placed on notice that petitioner intended to appeal that issue.

In contrast, Harvard's exception was not to the remedy recommended by the ALJ, but to the ALJ's imposition of the existing contract on Harvard at the time of the acquisition. Harvard never indicated in either its exceptions or brief in support thereof that it took separate exception to any part of the ALJ's remedial order. Thus, because Harvard took no issue with the ALJ's recommended remedial order at the time appropriate under the Act and

pursuant to the Board's practice, we find that the issue of remedy is not properly before this Court.[5]

### III. CONCLUSION

We hold that the Board's decisions are based on substantial evidence taken on the record as a whole and that petitioner's objections to the Board's remedies are unreviewable by this Court. The petition, therefore, is denied and the Board's order enforced in full.

---

5. *See NLRB Rules and Regulations,* 29 C.F.R. § 102.46(a) (exceptions to the recommended order "are [to be] filed within twenty days after service thereof" unless the Board extends the time for filing).